236 F.3d 1115 (9th Cir. 2001)
 ALONSO ANTONIO BARAHONA GOMEZ; CARMEN VICTORIA VAZQUEZ DE BARAHONA; ALONSO ANTONIO BARAHONA-VASQUEZ; BRENDA VERZOSA; DINO VERZOSA; HUMBERTO JAVIER-RIVAS; BOSCO GUILLERMO RIVAS; CAROLE BELTRAN; SANTIAGO RAMON SEQUEIRA; GRACIELA DE LOS ANGELES ISARIUZ; SANDRA LOS ANGELES SEQUEIRA; MARTA AGUILAR, Plaintiffs-Appellees,
v.
JANET RENO, Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; MICHAEL CREPPY, Chief Immigration Judge; PAUL SCHMIDT, Chairman of the Board of Immigration Appeals, Defendants-Appellants.
ALONSO ANTONIO BARAHONAGOMEZ; CARMEN VICTORIA VAZQUEZ DE BARAHONA; ALONSO ANTONIO BARAHONA-VASQUEZ; BRENDA VERZOSA; DINO VERZOSA; HUMBERTO JAVIER-RIVAS; BOSCO GUILLERMO RIVAS; CAROLE BELTRAN; SANTIAGO RAMON SEQUEIRA; GRACIELA DE LOS ANGELES ISARIUZ; SANDRA LOS ANGELES SEQUEIRA; MARTA AGUILAR, Plaintiffs-Appellees,
v.
JANET RENO, Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; MICHAEL CREPPY, Chief Immigration Judge; PAUL SCHMIDT, Chairman of the Board of Immigration Appeals, Defendants-Appellants.
 Nos. 97-15952, 97-17156
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 8, 1998
Opinion Filed February 11, 1999
Supplemental Opinion Filed January 10, 2001
Supplemental Dissent Filed January 10, 2001
 
 [Copyrighted Material Omitted]
 Michelle Gluck, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the defendants-appellants.
 Marc Van Der Hout, Van Der Hout & Brigagliano, San Francisco, California, Robert Jobe, Law Offices of Robert Jobe, Law Offices of Robert Jobe, San Franscico, California, Don Ungar, San Franciso, California, Linton Joaquin, National Immigration Law Center, Los Angeles, California, Robert Rubin, San Francisco, California, of counsel for plaintiffs-appellees.
 Appeals from the United States District Court for the Northern District of California Claudia Wilken, District Judge, Presiding. D.C. No.CV-97-00895-CW
 Before: Cynthia Holcomb Hall and Sidney R. Thomas, Circuit Judges, and Robert H. Whaley,[1] District Judge.
 Opinion by Judge Thomas; Dissent by Judge Hall
 THOMAS, Circuit Judge:
 
 
 1
 In Barahona-Gomez v. Reno, 167 F.3d 1228 (9th Cir. 1999) ("Barahona I"), we affirmed a district court's entry of a preliminary injunction against delegates of the Attorney General. Shortly after that opinion was filed, the Supreme Court issued its opinion in Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999) ("American-Arab"). Although the parties to Barahona I did not seek rehearing of their case, we sua sponte requested that they provide supplemental briefing concerning the effect of American-Arab on the district court's jurisdiction to enter the preliminary injunction. Having now considered our decision in light of American-Arab, as well as other circuit court cases decided in the wake of American-Arab, we reaffirm our original judgment.
 
 
 2
 * The salient facts of the controversy were described in Barahona I. In brief, this appeal concerns the propriety of a preliminary injunction enjoining the application of two directives issued by Board of Immigration Appeals ("BIA") Chairman Paul Schmidt and Chief Immigration Judge Michael Creppy that plaintiffs contend improperly halted consideration of their applications for suspension of deportation. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), as amended by Act of Oct. 11, 1996, Pub. L. No. 104-302, 110 Stat. 3656, amended the Immigration and Nationality Act ("INA") to (1) impose a 4,000 person annual limitation on the number of suspensions of deportation and adjustments of status that the Attorney General may grant in each fiscal year; and (2) provide that a person's accumulation of time toward the continuous physical presence requirement for suspension of deportation ends when he or she is served with a notice to appear. Concerned by the April 1, 1997, effective date for imposition of the 4,000 person annual limitation, BIA Chairman Schmidt and Chief Immigration Judge Creppy issued directives ordering a halt to the issuance of decisions granting suspension of deportation. Immigration judges ("IJ") were directed not to issue any decisions granting suspension of deportation until further notice; the BIA was instructed "not to process any appeals which might result in the grant of suspension of deportation."
 
 
 3
 In response to these directives, the plaintiffs sought injunctive relief against the deferral of their cases. As an example of the relief sought, plaintiff Barahona-Gomez alleges that in February 1997, an IJ determined that he and his family deserved a suspension of deportation, but declined to issue a formal decision to that effect because of the Creppy directive. Other examples are contained in Barahona I. After considering the parties' evidentiary tenders, the district court granted plaintiffs' preliminary injunction.
 
 
 4
 In Barahona I, defendants argued that, as of April 1, 1997, the district court lost subject matter jurisdiction pursuant to INA S 242(g) (codified at 8 U.S.C. S 1252(g)). We concluded that the district court had jurisdiction under S 1252(g) to enter the preliminary injunction, and also that its issuance was not an abuse of discretion. After reconsidering our decision in light of American-Arab, we reach the same conclusion.
 
 II
 
 5
 In Barahona I, we relied upon Walters v. Reno, 145 F.3d 1032 (9th Cir. 1998), cert. denied, 119 S. Ct. 1140 (1999), in holding that S 1252(g) did not preclude jurisdiction in this action. Walters involved a class action filed against the Immigration and Naturalization Service ("INS") alleging a denial of due process by inadequate notice of deportation procedures. The suit sought injunctive relief, which the district court granted. On appeal, the government cited S 1252(g) and, as it has in this case, challenged the district court's subject matter jurisdiction. In rejecting this argument, the Walters court wrote:
 
 
 6
 By its terms, the statutory provision relied upon by the government does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims. Those claims do not arise from a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," but instead constitute "general collateral challenges to unconstitutional practices and policies used by the agency." McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 492, 111 S. Ct. 888, 112 L. Ed. 2d 1005 (1991).
 
 
 7
 145 F.3d at 1052 (footnote omitted).
 
 
 8
 The Supreme Court's decision in American-Arab confirmed Barahona I's interpretation of S 1252(g). In American Arab, the Court repeatedly characterized this statutory provision as "narrow." 525 U.S. at 482, 487. Moreover, it made clear its disapproval of the "unexamined assumption that S 1252(g) covers the universe of deportation claims--that it is a sort of `zipper' clause that says `no judicial review of deportation cases unless this section provides judicial review.' " 525 U.S. at 482. In fact, the Supreme Court chided circuit courts for their "strained" and overly broad readings of the provision: "It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." Id. According to American-Arab, "Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." Id. at 485 n.9. By way of illustration, the Court articulated a non-exclusive list of events that might seem to be contemplated by the language of S 1252(g) but are nevertheless reviewable. For example, a decision to reschedule a deportation hearing is not unreviewable under S 1252(g); neither is a decision "to include various provisions in the final order that is the product of the adjudication." Id. at 482.
 
 
 9
 The situation from which plaintiffs seek relief is closely akin to a decision to include provisions in a final deportation order: Essentially, the Schmidt and Creppy directives result in a decision not to include certain provisions in a final decision. Moreover, there is no rational way to find that, in pressing for a final and just resolution of their deportation proceedings, plaintiffs are contributing to the "deconstruction, fragmentation, and hence prolongation of removal proceedings"--the evils meant to be remedied by the statute. 525 U.S. at 487.
 
 
 10
 Our reading of S 1252(g) is consistent with the illuminating philosophy of IIRIRA, which limits judicial review of decisions committed to the unfettered discretion of the INS. See, e.g., Kalaw v. INS, 133 F.3d 1147, 1150 (9th Cir. 1997) ("Congress clearly intended to limit judicial review over the discretionary decisions of the Attorney General and her delegates during the transitional period."). Various sections of IIRIRA identify specific discretionary acts not subject to judicial review.[2]
 
 
 11
 The Supreme Court recognized this in American-Arab, noting that "[o]f course many provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts-indeed, that can fairly be said to be the theme of the legislation." 525 U.S. at 486 (emphasis in original). This, the Supreme Court reasoned, was the purpose of S 1252(g). In protecting the Attorney General's prosecutorial discretion, the Court concluded that S 1252(g) "applies only to actions that the Attorney General may take: her `decision or action' to `commence proceedings, adjudicate cases, or execute removal orders'." Id. at 482. The Court noted that Congress had "good reason" to focus on these three discrete events, because "[a]t each stage the Executive has discretion to abandon the endeavor . . . ." Id. The Executive may elect to forego prosecution of a removal proceeding, to defer action,[3] to grant asylum, or to refer the asylum claim to an IJ for formal adjudication.
 
 
 12
 Such actions by the Executive are sharply different from the quasi-judicial, as opposed to quasi-prosecutorial, role of immigration judges. Section 1252(g) was aimed at preserving prosecutorial discretion. Neither IIRIRA nor the Supreme Court's decision in American-Arab endows immigration judges with such discretion. Indeed, this circuit has emphasized the narrow scope of discretion of immigration judges. See, e.g., Yao v. INS, 2 F.3d 317, 319 (9th Cir. 1993) ("As the BIA points out, the IJ was not empowered to terminate or suspend proceedings once initiated."); Lopez-Telles v. INS, 564 F.2d 1302, 1303-04 (9th Cir. 1977) (holding that "[i]mmigration judges are creatures of statute" and that, under Ninth Circuit law, "the immigration judge is without discretionary authority to terminate deportation proceedings so long as enforcement officials of the INS choose to initiate proceedings against a deportable alien and prosecute those proceedings to a conclusion"). In Lopez-Telles, we stated specifically that "[t]he immigration judge is not empowered to review the wisdom of the INS in instituting the proceedings. His powers are sharply limited . . . . This division between the functions of the immigration judge and those of INS enforcement officials is quite plausible and has been undeviatingly adhered to by the INS." Id. at 1304.
 
 
 13
 The regulations governing immigration judges and the BIA plainly support this long-held understanding of their limited discretion. Upon the filing of an application for asylum or withholding of deportation by an alien the INS "shall adjudicate the claim of each asylum applicant whose application is complete." 8 C.F.R. S 208.9. In contrast to the informal conferences conducted by asylum officers, formal rules of procedure govern the conduct of immigration court proceedings. See 8 C.F.R. S 292.3. Testimony of witnesses is taken under oath at a transcribed hearing, see 8 C.F.R. S 3.3, and subpoenas may be issued to compel witnesses to attend, see 8 C.F.R. S 3.35(b)(1). When a timely appeal from an IJ's decision to the BIA is taken, the BIA is obligated by regulation to consider the record and render a decision. See generally 8 C.F.R. SS 3.1-3.8. Formal procedural rules also govern the BIA's actions. See 8 C.F.R. S 292.3. These are quasijudicial functions, not discretionary acts. See 8 C.F.R. S 3.1 (BIA shall perform "quasi-judicial function of adjudicating cases"); S 240.31.[4]
 
 
 14
 In this context, the meaning of a discretionary decision to "adjudicate" is readily apparent: the discretionary, quasiprosecutorial decisions by asylum officers and INS district directors to adjudicate cases or to refer them to IJs for hearing are not reviewable under S 1252(g). See Alvidres-Reyes v. Reno, 180 F.3d 199, 205 (5th Cir. 1999). If an asylum application precedes the filing of an Order to Show Cause with the immigration court, the application is first considered by an asylum officer. See 8 C.F.R. S 208.9. The officer meets informally with the applicant, considers the documents presented with the asylum application, then decides whether asylum should be granted or whether the matter should be referred to an IJ for formal adjudication. See 8 C.F.R.S 208.2(a); S 208.14(b)(2). In other words, the asylum officer decides whether the removal action should be "abandoned " and asylum granted, or whether the formal adjudicatory process should proceed. It is this very decision to either "abandon the endeavor" or to adjudicate it that Congress wished to preserve from judicial review. See 525 U.S. at 484 ("Since no generous act goes unpunished, however, the INS's exercise of this discretion opened the door to litigation in instances where the INS chose not to exercise it." (emphasis in original)).
 
 
 15
 By affording asylum officers discretion to grant relief, Congress did not wish to open the door to judicial review of this purely discretionary, quasi-prosecutorial act. Thus, the asylum officer's "decision to adjudicate" is immunized from judicial review. Indeed, there is no other point in the asylum or removal process in which a "decision" is made whether or not to adjudicate.
 
 
 16
 In short, after the case has been initiated before an IJ, there is no longer any discretion as to whether a matter should be adjudicated or not. Unlike the Supreme Court, immigration courts do not have the power to decline to hear cases. Therefore, 1252(g) does not remove from judicial review actions in violation of mandatory duties of IJs and the BIA conducted pursuant to the usual rules of administrative procedure. Given the clear purpose of the statutory provision, not only is there nothing in American-Arab that alters our determination in Barahona I; it greatly strengthens our conclusion. If a "decision[ ] . . . to reschedule a hearing" is judicially reviewable, see 525 U.S. at 482, a decision to indefinitely suspend action on a case surely is. Subsequent developments in this circuit and our sister circuits also buttress our original judgment.
 
 
 17
 Recently, we considered en banc a similar argument in Catholic Social Services, Inc. v. Reno, 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc), and reached the same conclusion: that S 1252(g) does not remove federal jurisdiction to grant injunctive relief to classes of aliens challenging deportation procedures. We specified that "this provision applies only to the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings." Id. Our decision in this case goes no further.
 
 
 18
 As in Barahona I, Walters, and Catholic Social Services, other circuits have consistently held that decisions or actions that occur during the formal adjudicatory process are not rendered unreviewable because of S 1252(g). For example, in Selgeka v. Carroll, 184 F.3d 337 (4th Cir. 1999), the Fourth Circuit held that S 1252(g) did not deny the court jurisdiction to review plaintiff's procedural due process claim seeking to require an impartial IJ hear his asylum application and prepare an administrative record, instead of an INS officer who merely conducted an informal interview. Id. at 341-42. Likewise, in Singh v. Reno, 182 F.3d 504 (7th Cir. 1999), the Seventh Circuit held that the petitioner had stated a reviewable constitutional claim that the INS had denied his due process rights by failing to timely calendar his deportation hearing. Id. at 510. The court determined that INS "foot-dragging" had practically prevented petitioner from applying for a discretionary waiver. Id. Despite the government's contention that an alien had no substantive right to have a claim heard at any particular time, such an "abstract" concern was held to be irrelevant in the "very unusual circumstance" where the petitioner rather than the INS was pressing for a resolution of an alien's status. Id.; see also Mustata v. Dep't of Justice, 179 F.3d 1017, 1022 (6th Cir. 1999) (ineffective assistance of counsel claim raised in habeas petition not within "adjudicate cases" element of S 1252(g)); Garcia-Guzman v. Reno, 65 F. Supp. 2d 1077, 1082 (N.D. Cal. 1999) (change of venue decision by IJ not covered by S 1252(g)).
 
 III
 
 19
 The government also claims that 8 U.S.C. S 1252(f) forecloses plaintiffs' suit for injunctive relief. Section 1252(f)(1) specifically mandates that no court (other than the Supreme Court) has jurisdiction "to enjoin or restrain the operation" of 8 U.S.C. SS 1221-1231 "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated. " 8 U.S.C. S 1252(f)(1). However, S 1252(f) is a permanent rule provision. See IIRIRA S 309(c)(1). With the exception of S 1252(g), which was immediately effective to all cases, the permanent rules do not apply to aliens in exclusion or deportation proceedings prior to April 1, 1997, as were the plaintiffs in this instance. See Kalaw, 133 F.3d at 1150. As the Supreme Court noted in American-Arab,
 
 
 20
 the general rule set forth in S 309(c)(1) of IIRIRA is that the revised procedures for removing aliens, including the judicial review procedures of S 1252, do not apply to aliens who were already in either exclusion or deportation proceedings on IIRIRA's effective date.
 
 
 21
 525 U.S. at 477.
 
 
 22
 Further, by its own terms, S 1252(f) applies to the operation of SS 1221-1231 which are provisions relating to the new "removal" proceedings under the permanent rules rather than "deportation" and "exclusion" proceedings which were operative under pre-IIRIRA law and under the transitional rules. Thus, S 1252(f) plainly does not apply to the plaintiffs who are all in deportation or exclusion proceedings and subject to IIRIRA's transitional rules. Because the issue is not before us, we do not opine on the impact of S 1252(f) on permanent rule cases. Thus, the district court properly exercised jurisdiction over plaintiffs' claim that the Creppy and Schmidt directives improperly halted consideration of their applications for suspension of deportation.
 
 IV
 
 23
 Except for the further explanation of our jurisdiction as occasioned by the issuance of American-Arab, our original decision in Barahona I stands. Thus, we affirm the district court's entry of a preliminary injunction, which was within its jurisdiction. The district court did not err in requiring notice to the certified class, nor in establishing the appropriate amount of security. We remand for continuation of the litigation, and for the district court's further examination of the class pursuant to NACARA.
 
 AFFIRMED AND REMANDED
 
 
 Notes:
 
 
 [1]
 Honorable Robert H. Whaley, United States District Judge for the Eastern District of Washington, sitting by designation.
 
 
 [2]
 See, e.g., IIRIRA S 309(c)(4)(E) (precluding judicial review of discretionary decisions made pursuant to INA SS 212(c), 212(h), 212(i), 244 or 245); 8 U.S.C. S 1252(a)(2)(A) (limiting review of any claim arising from inspection of aliens arriving in the United States);S 1252(a)(2)(B) (precluding review of denials of discretionary relief authorized by various statutory provisions); S 1252(b)(4)(D) (limiting review of asylum determinations for resident aliens).
 
 
 [3]
 "Deferred action" refers to an exercise of administrative discretion by the INS district director under which the INS takes no action "to proceed against an apparently deportable alien" based on a prescribed set of factors generally related to humanitarian grounds. 6 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and ProcedureSS 72.03[2][a] & [2][h] (1998). The INS may "decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation." Id. "A case may be selected for deferred action treatment at any stage of the administrative process." Id.
 
 
 [4]
 The distinctions drawn between the discretionary, quasi-prosecutorial decisions of asylum officers and the mandatory quasi-judicial actions of IJs are found throughout the regulations. For example, with respect to plaintiffs' claims seeking resolution of their applications for suspension of deportation, an asylum officer is accorded with the authority to grant suspension of deportation if an applicant is eligible for such relief. See 8 U.S.C. S 240.70(b). However, the asylum officer is required to refer an application for suspension of deportation to an IJ for adjudication under several enumerated conditions. See id. S 240.70(d). Moreover, the INS district director is specifically authorized to withhold the adjudication of a visa petition or other application if it is determined that an "investigation has been undertaken involving a matter relating to the eligibility or the exercise of discretion . . . in connection with the petition or application" and the adjudication of the petition or application would prejudice the ongoing investigation. See 8 C.F.R. S 103.2(18).
 
 
 HALL, Circuit Judge, dissenting:
 
 24
 I dissent. The plain language of section 1252(g) deprives the district court, and this Court, of jurisdiction over the instant matter. The Supreme Court's decision in Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471 (1999), only strengthens the argument that the district court did not have jurisdiction over this issue of executive adjudication.
 
 
 25
 Section 1252(g) delineates three specific areas where Congress decided to streamline the immigration process by precluding judicial review. The statute states in relevant part:
 
 
 26
 Except as provided in this section and not with standing any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.
 
 
 27
 8 U.S.C. S 1252(g) (Supp. II 1996) (emphasis added).
 
 
 28
 The Supreme Court read section 1252(g) to prevent review of "three discrete actions" of the Attorney General. AmericanArab, 525 U.S. at 482. As the Court explained, the "theme" of the IRRIRA is to shield certain executive decisions on immigration from judicial interference. Id. at 486. While the Court called for a "narrow reading" of section 1252(g), it found that the statute prevented judicial review of the claims of several resident aliens who alleged that they were the targets of selective enforcement by the INS. Id. at 487. The resident aliens' claim that they had been targeted for deportation because of their affiliation with a politically unpopular group fell squarely within one of the three actions specified in section 1252(g): the Attorney General's decision to "commence proceedings."
 
 
 29
 Review is precluded in this matter because a different discrete action specified in section 1252(g) is involved: the Attorney General's decision to "adjudicate cases. " First, section 1252(g) applies to both the Attorney General and her delegates. See id. at 492 (applying section 1252(g) to decisions of the Immigration and Naturalization Service). BIA officials and immigration judges act under the authority of the Attorney General. See, e.g., 8 C.F.R. SS 3.0, 3.1 (describing the authority delegated by the Attorney General to the Executive Office for Immigration Review). Thus, section 1252(g) applies to their conduct as well as to the conduct of the Attorney General herself.
 
 
 30
 Second, and more importantly, the matter at issue is a clear example of a "decision or action . . . to . . . adjudicate." Section 1252(g). BIA Chairman Schmidt and Chief Immigration Judge Creppy ordered all immigration judges to temporarily stop processing appeals that could result in a grant of suspension of deportation. In other words, Schmidt and Creppy required the immigration judges to desist from deciding a selected set of cases. Within the discretion granted the Attorney General to decide to adjudicate cases is the inherent ability to choose not to adjudicate. Cf. Alvidres-Reyes, 180 F.3d 199, 205 (5th Cir. 1999) ("[T]he Attorney General's executive discretion to decide or act to commence proceedings always has been considered inherently to include the ability to choose not to do so.").
 
 
 31
 The decision of the BIA officials in this case to temporarily put a halt to suspension of deportation orders is precisely the sort of discretionary act that section 1252(g) was meant to shield from review. As the Court explained in Arab American, "Section 1252(g) seems clearly designed to give some measure of protection to `no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process the Congress has designed." See Arab American, 525 U.S. at 485; see also Alvidres-Reyes, 180 F.3d at 201 ("The Congressional aim of S 1252(g) is to protect from judicial intervention the Attorney General's long established discretion to decide whether and when to prosecute or adjudicate removal proceedings or to execute removal orders."). The plaintiffs' suit necessarily calls for court interference with the decision of BIA officials to exercise their discretion and temporarily halt the consideration of cases involving suspension of deportation. Plaintiffs are attempting to force immigration judges to adjudicate their suspension applications, but section 1252(g) forecloses district court review of the Attorney General's decision to adjudicate or not adjudicate a matter.
 
 
 32
 The decision whether or not to adjudicate referred to in section 1252(g) should not be limited to the more informal choices of asylum officers as the majority suggests. Both asylum officers and immigration judges have the power to "adjudicate" the status of an alien. See 8 C.F.R. S 208.2 (allowing an asylum officer to adjudicate an alien's asylum application if the alien appears to be deportable). Both exercise their discretion and determine the status of aliens through power conferred by Congress and the Attorney General. The language of section 1252(g) does not evidence a desire to shield one type of adjudication from review while leaving the other subject to district court interference.
 
 
 33
 The majority attempts to draw a distinction between formal, "mandatory" cases before an immigration judge and more informal uses of executive discretion. According to the majority, only the latter were meant to be exempted from judicial review under the statute. But if Congress's goal in passing the IRRIRA and section 1252(g) was to streamline the immigration decision making process, then immigration judges and the BIA should be exempted as well. As the Court noted in American-Arab, "Postponing justifiable deportation . . . is often the principal object of resistance to a deportation proceeding." 525 U.S. at 490. Congress's desire to clamp down on delaying tactics in immigration cases surely fits proceedings before an immigration judge as well as it does the decisions of an asylum officer. Moreover, an ordinary reading of the word "adjudication" would suggest activities relating to judging and making legal decisions, activities that fit even more closely with the conduct of an immigration judge than an INS official. See Webster's New Collegiate Dictionary 15 (1979) (defining "adjudicate" as "to settle judicially" or "to act as judge").
 
 
 34
 An interpretation contrary to the majority's would not immunize all decisions by immigration judges and the BIA from review. As the Court explained in Arab-American, there are many areas outside of adjudication that remain subject to judicial scrutiny under section 1252(g). The Court gave several examples of executive conduct that could still be examined by the courts: "[D]ecisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order" all remain open to review. American-Arab, 525 U.S. at 482. None of these examples provided by the Court go to the core function of adjudication. Instead, they are separate decisions that Congress has left subject to court review.
 
 
 35
 Moreover, immigration plaintiffs subject to section 1252(g) have other ways of contesting the Attorney General's procedures or her orders for removal. Courts may review alien detention orders, because although such an order is closely linked to efforts to deport, it "is not itself a decision to `execute removal orders' and thus does not implicate section 1252(g)." Cardoso v. Reno, 216 F3d 512, 516-17 (5th Cir. 2000); see also Humphries v. Various Federal USINS Employees, 164 F.3d 936 (5th Cir. 1999) (finding that claims for mistreatment while in detention and involuntary servitude due to threats of deportation were not barred by section 1252(g)). Direct review of constitutional claims that challenge deportation orders are available at the appellate level. See Singh v. Reno, 182 F.3d 504, 510-11 (7th Cir. 1999); Narangjo-Aguilera v. INS, 30 F.3d 1106, 1114 (9th Cir. 1994). Constitutional claims can also be reviewed in district court via a petition for writ of habeas corpus. See MaganaPizano v. INS, 152 F.3d 1213, 1220 (9th Cir. 1998). Thus, section 1252(g) removes a limited area of executive decision making from judicial scrutiny, but other adequate avenues of review still remain.
 
 
 36
 The Arab-American decision shows that section 1252(g) was meant to exclude core acts of executive discretion from district court review while leaving other avenues for review open. One of these core acts is the decision to "adjudicate cases." The administrative orders of Chief Immigration Judge Creppy and Chairman Schmidt were designed to temporarily postpone decisions on a selected group of cases. These representatives of the Attorney General decided to not adjudicate several cases, thus acting in a way that falls squarely within the language of section 1252(g). The majority's interpretation of the statute crafts an artificially limited definition of "adjudication" and ignores the other legal channels open to plaintiffs whose claims are blocked by 1252(g). For the foregoing reasons, I respectfully dissent