**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JARNAIL SINGH,

                *Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney General,

                *Respondent.*

No. 02-74426

Agency No.
A73-220-243

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
July 15, 2004—San Francisco, California

Filed April 13, 2005

Before: Betty B. Fletcher, Edward Leavy, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Leavy

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

George T. Heridis (argued) and Earle A. Sylva, Rai and Associates, San Francisco, California, for the petitioner.

Dimple Gupta (argued) and Allen W. Hausman, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

BERZON, Circuit Judge:

Jarnail Singh, a native and citizen of India, entered the United States without inspection in June 1994. He applied for asylum in November 1998, citing persecution by the Indian police because he supported Sikh separatism. The Immigration Judge ("IJ") denied Singh's applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), after making an adverse credibility determination. The Board of Immigration Appeals ("BIA") streamlined Singh's appeal and affirmed "the results of the decision below" pursuant to 8 C.F.R. § 1003.1(e)(4) (2002). We review the IJ's decision as the final agency determination, *see Falcon Carriche v. Ashcroft*, 350 F.3d 845, 851 (9th Cir. 2003), grant the petition for review, and remand.

## BACKGROUND

Singh's asylum application and testimony in support of his claims for relief from removal, taken together, stated the following: Singh was an active supporter of the Akali Dal Mann party and the All India Sikh Student Federation. On four occasions, the Indian police persecuted him because of his advocacy for a Sikh homeland of Khalistan. After his final arrest, he went into hiding. His wife and father were harassed and arrested because, while in hiding and going "to different places," Singh did not report to the police in accord with a condition of his last release from detention. In support of his applications for relief, Singh provided documentary evidence, including an affidavit from his father.

After Singh's removal hearing, IJ Anna Ho issued a written decision in which she made an explicit adverse credibility determination, specifying four grounds:

1) Singh omitted two details concerning his first arrest that were recounted in his father's supporting affidavit: a false

charge of spousal abuse and a promise he made when he was released that he would not associate with Sikh separatists.

2) There were discrepancies between two sets of arrest dates, those that Singh reported to an asylum officer in his asylum interview and those contained in Singh's testimony.

3) There was an inconsistency concerning Singh's role in a 1992 election boycott between Singh's father's affidavit and Singh's testimony.

4) There was a conflict between the father's affidavit and Singh's testimony concerning when Singh's last arrest took place.

As an alternative to the adverse credibility determination based on these four grounds, the IJ held that "even if assuming arguendo, the respondent's testimony to be true, the conditions of India have changed since he left the country." The IJ did not make an explicit finding about whether Singh's testimony, if credible, established past persecution.

Singh appealed to the BIA. Singh's attorney provided explanations in the brief for the grounds relied upon by the IJ in making her adverse credibility determination, stating that:

> [Singh] did not mention the false charge of spousal abuse because it was just that [—] a false charge created by the police to embarrass the respondent. . . . The respondent argues that he did not mention the charge because it did not deserve to be mentioned. . . . Concerning the promise not to associate with the Khalistan movement, the respondent also did not consider it worthy of mention. It was a promise extracted from him by the police. He did not give it freely and did not believe that he was bound by it.

In addition, the brief stated "that [Singh] was nervous during his meeting with the asylum officer and that accounts for his

errors [during the asylum interview].” On the issue of the election boycott, the brief “maintain[ed] that [Singh] was involved in the movement and that it was not, as the IJ argues, a single event, the boycott of the election. . . . The fact that he was in prison on the day of the election does not prove that he did not participate in the movement.” Finally, the brief argued that the date inconsistency identified by the IJ with respect to Singh’s last arrest was “minor.”

The BIA affirmed the results of the IJ’s decision without opinion. *See* 8 C.F.R. § 1003.1(e)(4) (2002).

## DISCUSSION

## I

*a. Conflict between Singh’s testimony and his father’s affidavit with regard to Singh’s first arrest*

The IJ’s adverse credibility conclusion was based in part on her statement that:

> Singh testified that he was arrested on April 3, 1990, taken to the police station and beaten. This testimony conflicts with the statement provided by the respondent’s father, where the father wrote that the police filed a false charge of spousal abuse against the respondent. The respondent never mentioned this, nor did he mention that he had to promise that he would not associate with the Khalistan movement upon his release on April 3, 1990.

This ground for finding that Singh lied at his removal hearing is not supported by substantial evidence.

[1] First, Singh was not asked about his father’s statements regarding the false charges or the promise not to associate on cross-examination, and nothing he said at the hearing *con-*

*flicted* with those statements. Where an asylum applicant is "denied a reasonable opportunity to explain what the IJ perceived as an inconsistency in her testimony[, t]he IJ's doubt about the veracity of her story . . . cannot serve as a basis for the denial of asylum." *Chen v. Ashcroft*, 362 F.3d 611, 618 (9th Cir. 2004). Second, Singh did mention the release condition and the false charge in the declaration he attached to his asylum application:

> My father was able to secure our release . . . on the condition that they will have no associations with the Federation or the Khalistan movement. . . . Nevertheless, the following month, the government of Haryana filed criminal charges against me alleging that I had mistreated my wife. . . . When our case was finally presented before a court, my wife explained that the charges were false.

*Cf. Ochave v. INS*, 254 F.3d 859, 865 (9th Cir. 2001) ("The IJ must consider evidence contained in [an] application for asylum."). Third, nothing Singh said at the hearing conflicted with his father's statements; rather, Singh omitted two details. "[T]he mere omission of details is insufficient to uphold an adverse credibility finding." *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000). Moreover, Singh could not have had a nefarious reason for failing to testify to these matters, as they in no way detract from his eligibility for asylum: A *false* charge of spousal abuse is consistent with persecution on account of political opinion, as is the release condition mentioned by his father. *See Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000) (stating that if "discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, [they] have no bearing on credibility" (citations and internal quotation marks omitted)). That Singh did not repeat in his testimony peripheral details that he had already provided to the agency and that his father included in a supporting affidavit provides no support at all for the conclusion

that Singh was *not* "arrested on April 3, 1990, taken to the police station and beaten."

b. *Discrepancies between dates of arrest presented at Singh's asylum interview and in his testimony*

The IJ concluded that Singh:

> testified that he was arrested on April 3, 1990, June 22, 1991, January, 1992, and December 29, 1993. This testimony is inconsistent with his testimony before the asylum officer, wherein he told the asylum officer that he was arrested on March 10, 1991, and in December, 1991.

This adverse credibility finding is based solely on an alleged discrepancy identified by the asylum officer in his "Assessment To Refer."[1] For the following reasons, we find that this document cannot support the adverse credibility determination.

Singh represented in his asylum application, which he signed on November 8, 1996, that he was arrested in April 1990, June 1991, January 1992, and December 1993. At his asylum interview on October 14, 1998, according to the Assessment To Refer made that day by the asylum officer, Singh presented

> testimony which was not consistent. Applicant's declaration indicates that his second and third arrest[s] were in June 1991 and January 1992; not as he testified on March 10, 1991 and December 1991. Applicant's testimony regarding his third arrest was also inconsistent, he testified that his third arrest was in December 1991, then January 1992, then Decem-

---

[1] We have reproduced the Assessment To Refer in its entirety as an appendix to this opinion.

ber 1993 back to December 1991 and then January 15, 1992. Applicant determined that his third arrest was on January 15, 1992 after it was pointed out that he could not have been detained for one month [from] December 1991 to January 1992 and be released after the February 1992 elections as he had testified.

The IJ made only one — albeit imprecise — reference to the Assessment To Refer before she rendered her final decision of May 2, 2001, during a brief hearing on March 28, 2001, at which Singh's asylum application was admitted into evidence. There is no indication from the record that Singh received a copy of the Assessment To Refer prior to March 28, 2001, and it is unclear whether he or his counsel received a copy of the document then, or at any time before the IJ issued her decision.[2] The IJ stated to Singh's counsel on March 28, 2001: "I see that [government counsel] handed me a referral notice wherein your client's asylum was denied by the Asylum Office. . . . I'm going to go ahead and mark the

---

[2]At the March 28 hearing, the IJ asked Singh's counsel whether "you're going to ask the Court to review the denial [by the Asylum Office]." In fact, pursuant to the applicable regulation, Singh's asylum interview could not have led to a denial of asylum, but rather resulted in the referral of his application to the IJ for a de novo hearing. *See* 8 C.F.R. § 208.14(c)(1) ("If the asylum officer does not grant asylum to an applicant after an interview conducted in accordance with § 208.9 . . . in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings . . . .").

The "Referral Notice" sent to Singh two weeks after his asylum interview stated in bold: "This is not a denial of your asylum application," adding that "[t]he determinations [the Asylum Office] made in referring your application are not binding on the immigration judge, who will evaluate your claim anew." If, as appears to be the case, Singh was sent only the Referral Notice, then he would have learned simply that "your claim was deemed not credible" because: "You provided inconsistent testimony regarding the dates of your arrests and the lengths of your detentions."

*asylum application* as Exhibit 2, dated today and initial it."
(Emphasis added). The record does not reflect that any other
exhibits were admitted on March 28, 2001. The Assessment
To Refer is, however, included in the administrative record as
part of Exhibit 4, which bears the handwritten date "3/28/01"
along with the IJ's initials on the "Referral Notice" sent to
Singh (but not on the Assessment To Refer). The IJ's final
decision of May 2, 2001 states that "[o]n March 28, 2001, the
Service filed the Referral Notice from the Asylum Office,
which has been received as Exhibit 4." No independent men-
tion is made of the Assessment To Refer, which is character-
ized in the IJ's decision as Singh's "testimony before the
asylum officer."

At his removal hearing, Singh testified, consistent with his
asylum application, that he was arrested on April 3, 1990,
June 22, 1991, January 1992, and December 29, 1993. Neither
the IJ nor the INS[3] mentioned at the hearing the asylum offi-
cer's assertion that Singh had stated otherwise at his asylum
interview. Singh was not asked about whether the asylum
officer's report of the interview was accurate or, if it was, the
reason for the asserted date confusion.

We need not decide whether any date inconsistency
between the asylum interview and the removal hearing is minor.[4]

---

[3]On March 1, 2003, the INS ceased to exist and its functions were trans-
ferred to the newly-created Department of Homeland Security. *See
Aguilera-Ruiz v. Ashcroft*, 348 F.3d 835, 835 n.* (9th Cir. 2003). For the
sake of consistency, we refer to the INS in this opinion.

[4]The INS's position is that the asserted inconsistency between the asy-
lum interview and Singh's testimony regarding the date of the third arrest
goes to the heart of Singh's asylum claim, because it is at odds with
Singh's testimony about the February 1992 election boycott. Singh testi-
fied that he was detained for a month in January 1992, and released after
the February election. If Singh was released after the election, he could not
have been arrested in December 1991, as he allegedly told the asylum offi-
cer, and detained for only a month. The date discrepancy if it existed thus
amounted to at most a month. For reasons elaborated below concerning
general principles of date recollection, we are skeptical that such a dis-
crepancy supports an adverse credibility finding, but need not decide
whether it does.

*Cf. Bandari*, 227 F.3d at 1166 ("[W]e have frequently characterized discrepancies in dates which reveal nothing about an asylum applicant's fear of his safety to be minor inconsistencies that cannot form the basis of an adverse credibility finding." (citation and internal quotation marks omitted)). Assuming its pertinence, the asserted contradiction of Singh's statements at his asylum interview may not be relied upon as substantial evidence that he is not credible.

**[2]** Certain features of an asylum interview make it a potentially unreliable point of comparison to a petitioner's testimony for purposes of a credibility determination. *Barahona-Gomez v. Reno*, 236 F.3d 1115 (9th Cir. 2001), explained the significant procedural distinctions between the initial quasi-prosecutorial "informal conferences conducted by asylum officers" after the filing of an asylum application, and the "quasi-judicial functions" exercised by IJs, who preside over hearings in which "[t]estimony of witnesses is taken under oath at a transcribed hearing." *Id.* at 1120-21. *Barahona-Gomez* described the asylum interview as follows: "The officer meets informally with the applicant, considers the documents presented with the asylum application, then decides whether asylum should be granted or whether the matter should be referred to an IJ for formal adjudication." *Id.* at 1120.

It bears noting that the current role of asylum officers in conducting these interviews is significantly different from what it was a decade ago:

> [I]n 1995, the Attorney General amended the regulations and comprehensively restricted the asylum officers' authority over asylum applications. With the limited exception of nonimmigrants who are presently in a lawful status, an asylum officer has been divested of authority to deny an application for asylum and reduced merely to screening and granting all applications in which the applicant is subject to

removal, or referring the applicant's case to an Immigration Judge for an exclusion or deportation hearing. . . . The amendment of the regulations effectively removed the two principal functions — preparing a written assessment of the claim and rendering a written decision — that would require, or at least provide an impetus for, in the majority of asylum interviews, an asylum officer to keep an accurate and reliable record of the applicant's statements during the interview.

*In re R-S-J-*, 22 I. & N. Dec. 863, 881-82 (BIA 1999) (en banc) (Vacca, Board Member, concurring in part and dissenting in part) (citations omitted).[5]

[3] The current regulation applicable to asylum interviews provides that the "asylum officer shall have authority to administer oaths," 8 C.F.R. § 208.9(c), but not that the officer *must* take evidence under oath. In this case, there is no evidence that Singh's representations at the asylum interview were made under oath. Nothing in the Assessment To Refer indicates that an oath was administered. Nor was Singh asked during his removal hearing whether the evidence he provided to the asylum officer was under oath.[6]

---

[5]Asylum officers are a creation of the agency:

Congress has not designated either the position of 'asylum officer' or the full scope of authority to be exercised by an individual that the Attorney General has assigned to act as an 'asylum officer.' An asylum officer's authority derives principally from the Attorney General's authorization to 'establish a procedure' for an alien in the United States to seek asylum.

*In re R-S-J-*, 22 I. & N. Dec. at 878 (Vacca, Board Member, concurring in part and dissenting in part) (citing 8 U.S.C. § 1158(a)).

[6]For an example of a case in which the BIA was unsure whether an asylum interview took place under oath, see *In re R-S-J-*, 22 I. & N. Dec. at 864 (remanding for determination of the issue where "[t]he respondent has not alleged that he was not put under oath by the asylum officer, but there is no affirmative evidence that an oath was administered").

**[4]** In addition, "[u]pon completion of the interview, the applicant or the applicant's representative shall have an opportunity to make a statement or comment on the evidence presented." 8 C.F.R. § 208.9(d). Again, in this case the record does not reflect whether Singh was afforded an opportunity to comment on the evidence at the end of the asylum interview.

**[5]** Further, although Singh signed his asylum application, and later attested to it at his removal hearing, Singh was not, contemporaneously or at the removal hearing, asked whether the asylum officer's summation of his interview was accurate. At the time of the interview, Singh signed only a notice acknowledging that he would return to learn the results. Although asylum officers are sometimes called to testify at removal hearings to confirm the contents of their notes or reports, *see, e.g.*, *Li v. Ashcroft*, 378 F.3d 959, 962 (9th Cir. 2004), the INS presented no such testimony here.[7]

**[6]** Moreover, there is some reason to question the reliability of the Assessment To Refer. At removal hearings, asylum applicants are provided with translators to ensure due process. A court-provided translator interpreted at Singh's removal hearing, conducted in Punjabi. At asylum interviews, by contrast,

> [a]n applicant unable to proceed with the interview
> in English must provide, at no expense to the Ser-

---

[7]Because Singh has not raised the argument, we do not address whether the absence of the asylum officer for purposes of cross-examination rendered the Assessment To Refer inadmissible. *Cf. Saidane v. INS*, 129 F.3d 1063, 1065 (9th Cir. 1997) (holding fundamentally unfair the presentation of evidence where "the INS made no effort to call an admittedly available witness and relied instead on that witness's damaging hearsay affidavit"); *Cunanan v. INS*, 856 F.2d 1373, 1374-75 (9th Cir. 1988); *see also* 8 U.S.C. § 1229a(b)(4)(B) ("[T]he alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . .").

vice, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality . . . may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure to appear for the interview for purposes of § 208.10.

8 C.F.R. § 208.9(g). The asylum officer's Assessment To Refer does not mention a translator, yet states that Singh "was unable to provide any information beyond a short declarative sentence that the event[s] happened." We cannot tell — and nor could the IJ — whether the interview was conducted in Punjabi or, instead, in English, a language with which Singh is apparently not comfortable.

Our recent decision in *Li* illustrates the importance we have placed on ensuring that sufficient indicia of reliability exist before an asylum applicant's airport interview may properly be used as an impeachment source. *Li* stated:

We hesitate to view statements given during airport interviews as valuable impeachment sources because of the conditions under which they are taken and because a newly-arriving alien cannot be expected to divulge every detail of the persecution he or she sustained. But here, the IJ heard substantial evidence from Inspector Westlake [Li's INS interviewer] about the procedures used to ensure that interviews were accurately understood and recorded. Both the INS supervisor and the interpreter would carefully question and evaluate the alien before the interview; if any sign of a language barrier was detected, the interview would be halted until an

appropriate interpreter could be found. After the interview, the interpreter would review questions and answers line-by-line with the alien to ensure there were no translation problems and to correct any misstatements that may have occurred.

378 F.3d at 962-63 (citations omitted). In this case, by contrast, the asylum interviewer did not testify, and the reliability of Singh's Assessment To Refer is insufficiently supported by the record. On the critical question of when Singh's second and third arrests occurred, for example, the assessment states that the asylum officer "pointed out" to Singh that his dates were inconsistent. With only a written summary, but no transcript or contemporaneous notes nor any testimony by the asylum officer or Singh (as he was not asked), it is impossible to discern precisely how, when, and in what context this interjection occurred. Without that detail, one cannot sensibly evaluate Singh's reaction to the interjection, including whether he offered an explanation for any discrepancy and whether he affirmatively changed his story or instead failed to object to an assertion by the interviewer. Just as the IJ's assertion in her opinion that there was an inconsistency between Singh's testimony and his father's affidavit concerning Singh's participation in the 1992 election boycott, discussed below, cannot be evaluated without knowing what Singh actually said, so the asylum officer's Assessment To Refer is not sufficient evidence of what Singh said to permit evaluation of an asserted conflict.[8]

---

[8]Singh did state in his brief to the BIA "that he was nervous during his meeting with the asylum officer and that accounts for his errors [during the asylum interview]." This explanation was made on appeal to the BIA. There had been no questioning regarding the asserted error at the removal hearing. At that point, absent a remand, the record could not be amplified with respect to the details of Singh's asylum interview, so he could only "address the credibility question before the BIA" on the basis of the existing record. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660-61 (9th Cir. 2003) (due process requires as a "constitutional minimum" that a petitioner be "afforded . . . notice that his credibility was at issue and an

**[7]** In sum: The Assessment To Refer does not contain any record of the questions and answers at the asylum interview, or other detailed, contemporary, chronological notes of the interview, but only a short, conclusory summary — essentially, an opinion. There is no transcript of the interview. There is no indication of the language of the interview or of the administration of an oath before it took place. The asylum officer did not testify at the removal hearing. Finally, the applicant was not asked at the hearing before the IJ about the accuracy of the asylum officer's report or given any opportunity to explain the discrepancies the asylum officer perceived. We conclude that under these circumstances, the Assessment To Refer, standing alone, is not substantial record evidence supporting the IJ's adverse credibility ground.

*c. Election boycott*

The IJ's decision also stated that Singh's father

> wrote that the respondent was engaged in the election campaign of 1991 and boycott movement of 1992, but the respondent testified that he was in custody prior to the boycott since he gave money to the Akali Dal Mann movement. The respondent testified that he was in prison during the boycott and was not released until after the boycott. Thus, his testimony is materially inconsistent with his father's statement that he was involved in the boycott movement.

**[8]** There is no such contradiction. Singh testified that he gave money "to help the people to boycott that [election],"

opportunity to respond to the bases for attack on his credibility"). Given that limitation, Singh's lawyer's argument on appeal concerning unspecified "errors" during the asylum interview does not constitute an admission that the Assessment To Refer accurately reflects the content of Singh's asylum interview.

and characterized his activities, for which he was arrested, as "participating" in the boycott movement: "[T]he police arrested me . . . because I collected funds for the Federation. . . . [T]hey told them that you told the people, you're telling people not to take part and . . . that's the reason they arrest you." The father's affidavit is not to the contrary. It states that Singh "actively engaged in the . . . boycott *movement* of 1992" (emphasis added), not that he himself purportedly boycotted the election, or was in the streets on election day. The purported inconsistency identified by the IJ thus does not exist, and does not support the adverse credibility determination. *See Singh v. Ashcroft*, 301 F.3d 1109, 1112 (9th Cir. 2002).

*d.    Discrepancy between Singh's testimony and his father's affidavit with respect to the last arrest*

The IJ stated that: "The respondent testified that his last arrest was December, 1993, whereas his father wrote inconsistently that his son was subjected to worse beating and torture during his last police experience in January, 1994. The respondent testified he was arrested and beaten for two days on December 29, 1993."

Singh's father's affidavit does state that Singh's "last police experience" was in January 1994.[9] Singh testified more specifically that he was arrested on December 29, 1993, kept in police custody and tortured for two days, and then imprisoned for about a month before being released on condition that he report to the police weekly. According to both Singh and his father, Singh had a "police experience" in January 1994; the only discrepancy, such as it is, is that Singh stated that the

---

[9]This affidavit states that Singh was "subjected to worse conditions, beating and torture" during this detention. The INS argues that Singh's father meant "worst," but, read in context, the affidavit appears to be referring comparatively to Singh's brother, who has been granted asylum in the United States.

"experience" *began* in the last three days of December, while the father only mentions January. That the two reports are as close as they are regarding the timing of the last arrest, even though both were given several years later, supports rather than detracts from Singh's credibility.

**[9]** More generally, the IJ's focus on minutely disparate dates for an arrest that took place seven-and-a-half years before the removal hearing reflects a flawed approach to credibility determination. The ability to recall precise dates of events years after they happen is an extremely poor test of how truthful a witness's substantive account is.

All of us have had the experience of having a lucid recollection of a particular event, yet being unable to date the event within months or even years. Scientific research supports this observation:

> Among the most common failures of source memory is remembering when something happened. . . .

> Victims of repeated physical or sexual abuse, for example, remember the gist of their experiences. However, they often confuse the details of particular incidents, including the time or dates of particular assaults and which specific actions occurred on which specific occasion. As events recur, it can become difficult to remember exactly when specific actions occurred even though memory for what happened is clear.

> Notwithstanding our inability to accurately report times and dates, witnesses are commonly asked to do so.

Deborah Davis & William C. Follette, *Foibles of Witness Memory for Traumatic/High Profile Events*, 66 J. Air L. & Com. 1421, 1514-15 (2001) (footnotes omitted).

**[10]** The phenomenon of poor date recollection is often particularly evident in the culturally diverse and trauma-filled setting of refugee claim adjudication.[10] "Events that are central to an asylum case in a legal sense may not be what an applicant perceived to be important when the events happened. . . . Details such as dates, which people often do not remember, may be unreasonable to expect." Michael Kagan, *Is Truth in the Eye of the Beholder? Objective Credibility Assessment in Refugee Status Determination*. 17 Geo. Immigr. L.J. 367, 385-86 (2003); *see also* Ilene Durst, *Lost in Translation: Why Due Process Demands Deference to the Refugee's Narrative*. 53 Rutgers L. Rev. 127, 156 (2000) (noting that certain societies "simply do not think in terms of schedules, dates, or units of time, as Westerners do; 'time' in these cultures is situational, social, or activity-focused").

The reason for applicants' lapses in date recollection is that calendar dates are frequently not part of the *direct* mental picture of an event that is recorded in one's memory. Scientists have identified a commonly-held and mistaken "chronological illusion" that considers chronology to be intrinsic to autobiographical memory. *See* William J. Friedman, *Memory for the Time of Past Events*, 113 Psychol. Bull. 44, 44 (1993). In fact, accurately described, chronology is but a "thin veneer on the more basic substance of coincidence, locations in recurrent patterns, and independent sequences of meaningfully related events." *Id.* at 61-62.

---

[10]As noted in a recent empirical study of Kosovar and Bosnian refugees:

> Laboratory and field studies have shown that people recall more details that are central when an event has a high level of emotional impact, such as armed robbery, than when an event is emotionally neutral. *Their recall of central details is, however, at the expense of their recall of peripheral details. Also, peripheral detail is more susceptible to disruption after the event.*

Jane Herlihy et al., *Discrepancies in Autobiographical Memories — Implications for the Assessment of Asylum Seekers: Repeated Interviews Study*. 324 Brit. Med. J. 324, 325 (2002) (emphasis added) (endnote omitted).

People do not walk around with the equivalent of date stamps in their heads, like the camera feature that produces photographs identifying the date on which pictures were taken; if they did, that feature would be unnecessary. *See id.* at 58 ("[T]hat internal time tags or conventional dates are regularly assigned . . . has no support."). Instead, we "naturally code long-term memories by the meaning and associations attached to them, so that the information remembered is an interpretation, not a true recording." Kagan, *supra*, at 385. Attaching a date to an event has to be accomplished by a separate mental effort. That effort can occur, for a "small minority of events," Friedman, *supra*, at 58, simultaneously with the sensory experience, because of a strong desire to remember the date, of one's wedding, for example, or of President Kennedy's assassination.

**[11]** More commonly, connecting events to dates occurs later, through a cognitive process of reconstructing a date from written records, or by carefully recalling clues — such as a sequence of events, a seasonal climate, proximate holidays, etc. — until one arrives at an ascertainable date, or at least a signifier from which an event's date can be calculated relatively accurately. *See* Juliet Cohen, *Questions of Credibility: Omissions, Discrepancies and Errors of Recall in the Testimony of Asylum Seekers*, 13 INT'L J. REFUGEE L. 293 (2001) ("[W]e can recall the year in which the dog was lost on the beach by attaching other memories to that year such as the age of the dog, the people present at the incident, the emotions experienced, and so on."). Searching for a discrete date by "jogging" one's memory is a method that depends on sifting an unpredictable number of reference points. *See* Friedman, *supra*, at 59 ("[T]he amount and nature of available contextual information differ greatly from event to event because of variation in the initial significance of the event, loss of information with the passage of time, schematization of repeated similar experiences, and many other idiosyncratic influences."). The process is therefore fraught with potential inaccuracies, *see, e.g.*, Norman R. Brown et al., *The Subjec-*

*tive Dates of Natural Events in Very-long-term Memory*, 17 COGNITIVE PSYCHOL. 139 (1985), in a manner that other types of memory retrieval — such as considering the *relative* recency of sequential events (e.g., an arrest and a later, related trial) — may not be, absent mental impairment. Consistently with the phenomenon that most date recollection involves a reconstructive process prone to inaccuracy, we have held that "minor discrepancies in dates that . . . cannot be viewed as attempts by the applicant to enhance his claims of persecution have no bearing on credibility." *See, e.g.*, *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986). We adhere to that principle here, and conclude that the IJ's reliance on her perception of a date discrepancy between Singh's account of his last arrest and that given in his father's affidavit is not a valid ground for the adverse credibility determination.

----

As we have determined that none of the reasons cited by the IJ "are valid grounds upon which to base a finding that the applicant is not credible," *Mendoza Manimbao*, 329 F.3d at 658 (citation and internal quotation marks omitted), we need not address whether the agency's failure to address Singh's explanations for the alleged incongruities affects the validity of the IJ's adverse credibility determination. *Cf. Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004) ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency."); *Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004).

## Conclusion

[12] None of the four adverse credibility grounds relied upon by the IJ is supported by substantial evidence. The IJ did not determine whether Singh's testimony, if credible, established past persecution or a well-founded fear of persecution. We therefore remand for further proceedings, accepting Singh's testimony as credible, to determine his eligibility for

asylum, withholding of removal, and CAT relief. *See He v. Ashcroft*, 328 F.3d 593, 603-04 (9th Cir. 2003); *cf. INS v. Ventura*, 537 U.S. 12 (2002) (per curiam).

**PETITION FOR REVIEW GRANTED; REMANDED.**

---

**APPENDIX**

***ASSESSMENT TO REFER***

Applicant is a 33-year-old male native of India and citizen of India.

Applicant credibly testified he entered the United States without inspection on June 8, 1994, at San Ysidro, CA, and was admitted as a [*sic*] and showed by clear and convincing evidence that he timely filed.

Applicant fears that he will be harmed on account of his political opinion.

Applicant testified that he was a member of the All India Sikh Student Federation (Federation). As a member of the Federation, Applicant collected funds and pasted posters. He was arrested four times. He was arrested April 3, 1990; March 10, 1991; December 1991; and December 29, 1993. After each arrested [*sic*] Applicant was detained for various lengths of time and was beaten and tortured by the police.

Applicant presented testimony which was not consistent or sufficiently detailed. Therefore, he was not found to be credible.

Applicant presented testimony which was not consistent. Applicant's declaration indicates that his second and third arrest were in June 1991 and January 1992; not as he testified

on March 10, 1991 and December 1991. Applicant's testimony regarding his third arrest was also inconsistent, he testified that his third arrest was in December 1991, then January 1992, then December 1993 back to December 1991 and then January 15, 1992. Applicant determined that his third arrest was on January 15, 1992 after it was pointed out that he could not have been detained for one month was [*sic*] December 1991 to January 1992 and be released after the February 1992 elections as he had testified. Applicant also testified that he left India on June 2, 1994, however, he also testified that after his last arrest in December 1993 he was detained for one month and upon his release, he left India within a few days time. This information is material to Applicant's claim because he testified that he was [*sic*] left India due to these arrests.

Applicant presented testimony which was not detailed. Applicant was repeatedly asked to describe his arrests and his political activities. However, he was unable to provide any information beyond a short declarative sentence that the event happened. This information is material to Applicant's claim because he testified that he left India due to these arrests which occurred after he engaged in political activity.

Applicant has not shown there is a reasonable possibility of suffering the persecution that he fears.

For the foregoing reasons, the applicant is not eligible for asylum status in the United States. Assessment is to refer to the Immigration Judge.

---

LEAVY, Circuit Judge, concurring:

I concur in the result. The adverse credibility determination is not supported by substantial evidence.

This circuit has articulated a rule of law that "Minor inconsistencies in the record that do not relate to the basis of an applicant's alleged fear of persecution, go to the heart of the asylum claim, or reveal anything about an asylum applicant's fear for his safety are insufficient to support an adverse credibility finding." *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660 (9th Cir. 2003). The several citations to medical and psychological journals that discuss the scientific explanations for lapses in date recall, none of which are in the record, suggest that our appellate decision is premised on factfinding that has not been tested by the adversarial process. Furthermore, the opinion incorrectly suggests that an inaccurate process of date recollection is the reason underlying our "minor discrepancy" jurisprudence. I would find it sufficient to rely upon our well-established precedent. By engaging in our own factfinding, we invite another court, or even an administrative body, to reject our holding as precedent, if, in its superior factfinding process, it finds that we are wrong on the facts.