*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARIAMA KOULIBALY,

*Petitioner-Appellant,*

*v.*

No. 07-3743

MICHAEL MUKASEY,

*Respondent-Appellee.*

---

On Appeal from the Board of Immigration Appeals.
No. A98 528 129.

Submitted: July 31, 2008

Decided and Filed: September 4, 2008

Before: KENNEDY, GILMAN, and GIBBONS, Circuit Judges.

---

### COUNSEL

**ON BRIEF:** Jessica Rodriguez Bell, BELL LAW OFFICE, Columbus, Ohio, for Petitioner. Nicole N. Murley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

### OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Petitioner-appellant Mariama Koulibaly seeks review of the Board of Immigration Appeals' ("BIA") order of removal. Koulibaly argues that the BIA erred by: (1) adopting and affirming the Immigration Judge's finding that Koulibaly was not credible; and (2) denying Koulibaly's applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). For the following reasons, we grant Koulibaly's petition for review, vacate the judgment of the BIA, and remand for further consideration.

I.

Koulibaly, a citizen of Guinea, entered the United States on or about January 8, 2004 under a visitor's visa. On December 17, 2004, Koulibaly filed an application for asylum and withholding of removal.[1] In her original asylum application, Koulibaly indicated that she was applying for

---

[1]The Department of Homeland Security instituted removal proceedings against Koulibaly on January 25, 2005.

asylum and withholding of removal based on political opinion. Koulibaly provided the following factual background for her application.

Her husband, Moussa Bangoura, was a bodyguard for President Lansana Conte. In December of 2002, Bangoura accompanied Conte on a trip to Saudi Arabia where Conte had a heart attack. Rumors spread of Conte's demise, although Conte was in fact still alive, and, on December 6, Conte addressed those rumors himself on a national broadcast.

On the evening of December 6, Koulibaly claimed that her husband "was called, interrogated and arrested. He was accused of being a spy of political leaders. After that, police officers came to our house and checked everything." According to Koulibaly, on December 9, she was "called interrogated and arrested." Koulibaly stated further: "After 7 days in jail, I was released. In jail, I was accused of being a member and spy of the political party." Koulibaly further stated that on July 14, 2003, soldiers came to her house to take her "back to jail," but she was at a "friend's house." She then "hid from the soldiers and went to Kindia" where her husband's uncle helped her secure a visa to the United States. Koulibaly also noted as follows: "My husband and I wanted to leave our country before December 2002 because he knew something would happen."

Koulibaly reiterated these claims in explaining the basis for her asylum application: "My husband and I were arrested and put in different jails; I was beaten and mistreated. Police officers and soldiers caused the harm; we were accused of being spies of political parties and also telling the bad news about the dictator president Conte." Based on this past treatment, Koulibaly explained her fear of harm or mistreatment if she were to return to Guinea: "I am fear [sic] to go back to Guinea because the Guinea authorities will put back in jail [sic] and mistreat me. Maybe use me as sexual object. [sic] Nobody can protect me like my husband." However, Koulibaly explained that she had not heard from her husband since December of 2002, after his arrest. For similar reasons, Koulibaly stated that she believed she would be tortured if she returned to Guinea: "Soldiers brought summonses and looked for me, but I was not home and they (Guinea authorities) finally issued a warrant of arrest againt [sic] me."

After Koulibaly submitted her original asylum application, it was referred to an asylum officer who conducted an interview of Koulibaly. The officer prepared a document known as an "Assessment to Refer," which was sent along with Koulibaly's application to an immigration court. During her interview with the asylum officer, Koulibaly stated that on the evening of December 6, 2002, five Gendarme soldiers came to her door. The Assessment to Refer summarized Koulibaly's description of the subsequent events, in relevant part, as follows:

> The soldiers spoke to Applicant's husband for a moment and then her husband left with the soldiers in their jeep. Applicant indicated the conversation between her husband and the soldiers was civil. He [sic] husband told her that he would be back later in the evening.

> Applicant's husband did not return to their home. On December 9, 2002 some soldiers came to Applicant's house and asked if her husband was affiliated with Alpha Conde, or any opposition leaders. After Applicant responded that he was not involved in any political organizations, she was arrested and taken to prison.

> Applicant was detained for seven days. She was never told why she and her husband were being detained. She was given little food and one night she was beaten. After seven days Applicant was simply released from custody and taken to a hospital. She did not have any injuries, although she spent one week in the hospital recovering her strength. . . .

> . . .

On the evening of July 14, 2003 when Applicant was visiting friends, some soldiers went to her house. Applicant was never informed as to why the officers were visiting her home.

Koulibaly filed a second application for asylum and withholding of removal on December 6, 2005. In this second application ("supplemental application"), Koulibaly stated the she was seeking asylum and withholding of removal based on race, political opinion, and membership in a particular social group. In addition, Koulibaly sought protection under the CAT. She also provided the following factual background as an addendum to her supplemental application:

On the night of December 6, 2002, around 9 p.m., my husband, daughter, and I and a few of the neighborhood children were at our home. We were watching television together. Approximately 10 soldiers came into our home. They grabbed my husband and ransacked our home. The soldiers took some of my husband's documents . . . . The soldiers did not say anything to us and they did not harm us. They only violently grabbed my husband and took him with them. The soldiers accused him of being a spy for opposition political leaders . . . .

On December 9, 2002, the soldiers came to my home and arrested me. I was held in jail for 7 days . . . . While in prison I was accused of being a member and spy of the opposition political parties. I told the soldiers I did not know anything about what they were talking about. Everytime that I would deny their accusations, the soldiers would beat me. I was tortured during the seven days that I was held. The guards would throw cold water on me, tie my hands behind my back, slap me in the face and kick and punch me. The soldiers would show me pictures of the opposition leaders, ask me to identify them, and to tell them what I know about them. After being held for seven days, I was sent to the hospital. I was very ill, malnurished [sic] and weak from the constant beatings.

Finally, after three weeks in the hospital (and still being guarded), I managed to escape. . . .

During her oral testimony, Koulibaly provided additional details regarding her experience in Guinea. Koulibaly explained that she "escaped from the hospital on the 1st of January 2003. That day, there was no electricity, and there were a lot of people injured. So, the doctors were busy, and that is how [she] fled because [she] was guarded." As Koulibaly further explained, her escape was successful because the guards were not at her side.

During cross-examination, the government attorney highlighted a number of inconsistencies in Koulibaly's description of the events preceding her arrival in the United States. First, despite the fact that Koulibaly stated that she did not have any fears or concerns about living in Guinea prior to the events of December 2002, she also stated in her first asylum application that she wanted to leave Guinea prior to December 2002 because she "knew something would happen." In response, Koulibaly said that it was her husband who indicated to her a desire to leave although he never explained the reason why. Second, the government attorney noted that, while according to the asylum officer's notes Koulibaly stated that five soldiers had come to her home on December 6, Koulibaly testified that ten soldiers had come to her home.

The government attorney also noted that Koulibaly's various descriptions of the events of December 6, 2002 were somewhat at odds. Specifically, in her initial asylum application, Koulibaly stated that her husband "was called, interrogated and arrested. He was accused of being a spy of political leaders." Only "[a]fter that, police officers came to our house and checked everything." In contrast, during her oral testimony, Koulibaly indicated that the police officers first came to her

house, then arrested her husband, and then took documents. In addressing this discrepancy, Koulibaly simply stated that she did not see a difference between the two accounts.

During cross-examination, the government attorney stated that while in the original asylum application Koulibaly did not mention being beaten, she mentioned being beaten once in her interview with the asylum officer, and she indicated in her oral testimony and her supplemental asylum application that she was beaten throughout the seven days she was in prison. Furthermore, Koulibaly seemed to indicate that there were guards in her room while she was in the hospital, although under cross-examination Koulibaly stated that the guards were outside her room and that her room had two exits. And, Koulibaly stated in her asylum application that she was in the hospital for three weeks; given that she was imprisoned on December 9 for seven days, this would have meant that she remained in the hospital until January 6, 2003. However, Koulibaly testified that she escaped from the hospital on January 1, 2003. In addition, the government attorney noted that although Koulibaly during her oral testimony stated that soldiers again came looking for her while she was already in Kindia, Koulibaly stated in her asylum application that she only left for Kindia after the soldiers came looking for her on July 14, 2003.

In her application for asylum, Koulibaly also submitted supporting documentation, which included, *inter alia*, a warrant for her arrest in Guinea. As noted by the government attorney, the blanks on the warrant for physical description were not filled in.

After conducting a hearing, the immigration judge ("IJ") concluded that Koulibaly was not credible. In doing so, the IJ emphasized that Koulibaly's various descriptions of the events of December 6, 2002 – the night her husband was arrested – were inconsistent. Furthermore, the various versions of her story regarding the treatment she received in prison and her hospital stay had not been consistent. In addition, Koulibaly had given inconsistent information regarding where she was when soldiers came to her home on July 14, 2003; her description of her escape from the hospital was vague; and her explanation of whether or not she had wanted to leave Guinea prior to the events of December 2002 was also vague. Together, the IJ concluded that these inconsistencies and overall vagueness indicated that Koulibaly was not credible. Because of this credibility determination, the IJ concluded that Koulibaly had not met her burden to prove that she had suffered past persecution or had a well-founded fear of future persecution. In turn, the IJ denied Koulibaly's application for asylum and withholding of removal. In addition, the IJ, again based on the credibility determination, concluded that Koulibaly had failed to meet her burden for relief under the CAT.

On appeal, the BIA affirmed the decision of the IJ because it found no clear error in the IJ's determination that Koulibaly was not credible. The BIA noted that the IJ supported his determination with "specific reasons based on the record that go to the heart of [Koulibaly's] claim." These material inconsistencies included, according to the BIA, Koulibaly's various descriptions of (1) the events leading up to her husband's arrest; (2) the extent and circumstances of her hospital stay; and (3) her location on July 14, 2003 when soldiers came to her home looking for her. The BIA also noted that Koulibaly had been vague in explaining the circumstances of her escape from the hospital. Thus, the BIA concluded "we find that there were indeed inconsistencies in the respondent's testimony and that they were material to her claims." Koulibaly now appeals the BIA's decision.

## II.

This court reviews the decision of the BIA where, as here, it has rendered its own opinion. *Anssari-Gharachedaghy v. INS*, 246 F.3d 512, 513 (6th Cir. 2000). "Although, this Court reviews the BIA's legal conclusions de novo, it must defer to the BIA's reasonable interpretations of the INA." *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005). Factual findings are reviewed under a substantial evidence standard "in which we uphold a BIA determination as long as it is 'supported

by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Marku v. Ashcroft,* 380 F.3d 982, 986 (6th Cir. 2004) (quoting *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992)). "Under this deferential standard, the court may not reverse the Board's determination simply because we would have decided the matter differently." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (internal quotation marks and citation omitted). Unless "any reasonable adjudicator would be compelled to conclude to the contrary," the BIA's findings of fact are "conclusive." 8 U.S.C. § 1252(b)(4)(B). Facts relevant to credibility determinations, denial of asylum applications, withholding of removal, and the CAT are all reviewed under this same standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004) (applying the substantial evidence standard to a credibility determination); *Ouda*, 324 F.3d at 451 (applying § 1252(b)(4)(B) standard of review to decision denying asylum); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (applying § 1252(b)(4)(B) to decision on request for withholding of removal and request for CAT relief). Thus, the BIA's determination should be upheld unless evidence "not only supports a contrary conclusion, but indeed *compels* it." *Ouda*, 324 F.3d at 451 (internal citation omitted and emphasis in original).

However, "[w]hile an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Sylla*, 388 F.3d at 926. Moreover, "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They 'cannot be based on an irrelevant inconsistency.'" *Id*. (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). Thus, "[i]f discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* (quoting *Daneshvar*, 355 F.3d at 623)); *Bah v. Gonzales*, 462 F.3d 637, 641-42 (6th Cir. 2006) (upholding adverse credibility determinations, despite the fact that it was "not based on overwhelming evidence," where the discrepancies involved the alien's alleged involvement in a political organization and treatment by the government of Guinea). *But see Sylla*, 388 F.3d at 926 (finding that inconsistencies where the petitioner, a Guinea native, "had little to gain" should not have played a part in the IJ's or BIA's adverse credibility determination).[2]

### III.

The facts of the instant case require that we address the proper role of an Assessment to Refer in supporting an adverse credibility determination. "The Assessment to Refer is a document prepared by an asylum officer who 'meets informally with the applicant, considers the documents presented with the asylum application, then decides whether asylum should be granted or whether the matter should be referred to an IJ for formal adjudication.'" *Golkar v. Mukasey*, 2008 U.S. App. LEXIS 8335, at *5 n.2 (9th Cir. Apr. 15, 2008) (quoting *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005)).

In *Singh*, the Ninth Circuit concluded that the Assessment to Refer relied upon by the IJ in that case could not, "standing alone, [be considered] substantial record evidence supporting the IJ's adverse credibility ground." 403 F.3d at 1090. Summarizing the reasons for this conclusion, the court explained the need for courts to ensure that there exist sufficient "indicia of reliability" before relying upon an Assessment to Refer. *Id*. at 1089. The Assessment to Refer under consideration in *Singh* lacked these indicia:

---

[2]As this court has previously noted, "The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), changed the standard governing credibility determinations, stating that those determinations may be made 'without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim.'" *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). This provision, however, applies only to applications for asylum, withholding of removal and other claims for relief filed on or after May 11, 2005. *Id.* (citing Pub. L. 109-13, div. B, § 101(h)(2), 119 Stat. 231 at 305).

> The Assessment To Refer does not contain any record of the questions and answers at the asylum interview, or other detailed, contemporary, chronological notes of the interview, but only a short, conclusory summary – essentially, an opinion. There is no transcript of the interview. There is no indication of the language of the interview or of the administration of an oath before it took place. The asylum officer did not testify at the removal hearing. Finally, the applicant was not asked at the hearing before the IJ about the accuracy of the asylum officer's report or given any opportunity to explain the discrepancies the asylum officer perceived.

*Id.* at 1089-90.

There are, of course, times where there are sufficient indicia of reliability such that an Assessment to Refer is properly used to support an adverse credibility determination. *See, e.g.*, *Yomba v. AG of the United States*, 254 F. App'x 900, 904 (3d Cir. 2007) (noting that the Assessment to Refer was "extensive," "four single-spaced pages in length," "quite detailed," and contained the questions and answers from the interview). Indeed, under such circumstances, courts should consider any relevant aspects of an Assessment to Refer to determine whether an adverse credibility determination is supported by substantial evidence. Moreover, the quality of a particular set of contemporaneous notes may vary, and thus, an Assessment to Refer may in fact be sufficiently reliable on certain points but not sufficiently reliable on others. In turn, when considering Assessments to Refer, a court's first task is to determine whether and to what extent there exist sufficient indicia of reliability.[3]

The Assessment to Refer in the case before us lacks some of these standard indicia of reliability. While it does have attached some contemporaneous notes from the asylum officer, the notes detail only some of the questions posed, making it difficult to determine what question Koulibaly was answering at many points during the interview. These notes are certainly not comparable to a transcript of the interview. Furthermore, the government did not provide evidence regarding either the language of the interview or whether an oath was administered before the interview. Finally, the asylum officer did not testify at the removal hearing. On balance, these factors counsel against relying on the Assessment to Refer as substantial evidence for the adverse credibility determination. This is all the more true when consulting the Assessment to Refer on points where the contemporaneous notes lack much detail.

---

[3]Koulibaly questioned the reliability of the Assessment to Refer a number of times during her hearing before the IJ. Koulibaly's attorney, in her closing, argued as follows:

> It is my belief that clearly the Asylum Officer did not note everything in her assessment, and it is strictly hearsay. Without the Asylum Officer here today to cross-examine, it is very difficult to know exactly what was perhaps included or not included in her assessment. It is not a court transcript, it's simply the Asylum Officer's notes . . .

Under redirect, Koulibaly also emphasized this point:

> Q:　　Is it possible that the Asylum Officer did not interpret all of your statements that day.
> A:　　I believe so.

Koulibaly also challenged the Assessment to Refer in her brief before the BIA, although she did so by arguing that inclusion of the Assessment to Refer violated the internal Operating Policies and Procedures Memorandum from the Office of the Chief Immigration Judge.

A.

Having noted the relative unreliability of the Assessment to Refer, we consider below each of the grounds relied upon by the BIA in order to determine whether the adverse credibility determination was supported by substantial evidence.

### i.       The Arrest of Koulibaly's Husband

At the hearing before the IJ, the government attorney cross-examined Koulibaly on the inconsistency between Koulibaly's descriptions of the events of December 6, 2002. In her first asylum application, Koulibaly stated that on the evening of December 6, her husband "was called, interrogated and arrested. He was accused of being a spy of political leaders. After that, police officers came to our house and checked everything." At the hearing before the IJ, Koulibaly stated that "[t]hey took my husband and they put chains on him, and they searched the house, and they took some documents from the bedroom." Based on these two descriptions, the following exchange took place:

> Government:  Well, in statement [sic] in your original application, to me it seems that your husband was called to the police department. And then after they did that, the officers came to your house. And in your statement today, it sounded like the police officers came to your house, arrested him and searched your house at the same time. Is that what happened?

> Koulibaly:    Well, I don't know, but I, there is I don't, perhaps there is no difference between the two statements. Perhaps what happened is that the interpreter, the first time, is the one who made the mistake. But for me, the story remains the same.

The BIA relied on this discrepancy in affirming the IJ's adverse credibility determination. However, it is far from clear that "called" in Koulibaly's first asylum application meant that her husband was called to the police department. Although in her first asylum application, Koulibaly did state that her husband was called and only then interrogated and arrested, Koulibaly never stated that her husband was, as the government attorney suggested, called to the police station.

The BIA also noted that the Assessment to Refer presented a different description of the events of that evening, where the soldiers came to the house and then Koulibaly's husband left with the soldiers, saying that he would be back that evening. In his contemporaneous notes, the asylum officer records the following: "[The soldiers] came into the living room and spoke to my husband . . . . They took him to the car and drove him away. They did not hurt him." However, as noted above, relying on the Assessment to Refer is problematic because it lacks many indicia of reliability. Moreover, reviewing the various descriptions of the events of December 6, 2002, the evidence on this issue does not support an adverse credibility finding because there appears to be no contradiction between Koulibaly's oral testimony and her initial asylum application. In addition, Koulibaly's supplemental asylum application is consistent with her description of these events.[4] The description of these events in the Assessment to Refer is also, at best, only slightly different and, more importantly, not particularly reliable given both the overall context of the Assessment to Refer

---

[4]In her supplemental asylum application, Koulibaly described the events consistent with her testimony before the IJ:

> On the night of December 6, 2002, around 9 p.m., my husband, daughter, and I and a few of the neighborhood children were at our home. We were watching television together. Approximately 10 soldiers came into our home. They grabbed my husband and ransacked our home. The soldiers took some of my husband's documents . . . .

and the vagueness of the asylum officer's contemporaneous notes on this point. To use such grounds to support an adverse credibility determination would be to rely on inconsistencies that are either "*de minimis* in scope or chimerical in nature." *See Abbo v. Gonzales*, 150 F. App'x 524, 528 (6th Cir. 2005) (reversing the IJ's adverse credibility determination). As such, this ground, as articulated by the BIA, does not serve as substantial evidence justifying the adverse credibility determination.

### ii. Koulibaly's Testimony Regarding the Hospital Stay

The BIA also relied upon Koulibaly's failure to mention in her initial asylum application that she was hospitalized after being detained and beaten. In addition, the BIA noted that the Assessment to Refer did not mention that Koulibaly was guarded during her hospitalization. However,

> the failure of an applicant to provide an exhaustive list of details in his original asylum application does not amount to an inconsistency warranting an adverse credibility finding, given that "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding."

*Hamida v. Gonzales*, 478 F.3d 734, 739 (6th Cir. 2007) (quoting *Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005)). Moreover, the omission of facts in the Assessment to Refer is all the more suspect given its relative lack of reliability.

### iii. Location on July 14, 2003

The BIA noted that Koulibaly testified that she had relocated to Kindia when soldiers came to her home on July 14, 2003, to arrest her. However, in her initial asylum application, Koulibaly stated that she was at a friend's house on July 14, 2003, when soldiers came to her home to arrest her. While these two versions of events are inconsistent, such an inconsistency does not go to the heart of Koulibaly's claims of past persecution and, in turn, her likelihood of future persecution[5] because it "'cannot be viewed as [an] attempt[] by the applicant to enhance [her] claims of persecution . . . .'" *See Sylla*, 388 F.3d at 926 (quoting *Daneshvar*, 355 F.3d at 623).

### iv. Treatment While in Prison

The BIA states that while Koulibaly gave testimony that she was beaten every day during her incarceration, "she did not mention ever being beaten in her Form I-589 . . . ." This is simply not correct. In her initial asylum application, Koulibaly stated: "My husband and I were arrested and put in different jails; *I was beaten and mistreated*. Police officers and soldiers caused the harm . . . ." (JA 128 (emphasis added)).[6] The BIA also noted that according to the Assessment to Refer, Koulibaly was only beaten once: "She was given little food and one night she was beaten." However the Assessment to Refer lacks some of the standard indicia of reliability and would seem

---

[5] Although Koulibaly seems to contest whether she actually stated that she was already in Kindia on July 14, 2003, she did make such a statement while under cross-examination.

[6] This error appears to stem from the fact that Koulibaly never reiterated this claim in the section of her asylum application dedicated to "additional information."

particularly unreliable in a context, such as this, where Koulibaly's statement of being beaten once might have been in response to any number of questions.[7]

### v.      Dates of Hospitalization

The BIA also noted that the IJ found "an inconsistency between the date that [Koulibaly] testified that she escaped from the hospital and the amount of time that she had been hospitalized." This inconsistency stems from Koulibaly's testimony that she escaped on January 1, 2003, but stated in her asylum application that she was in the hospital for three weeks as of December 16, 2002. Thus, the three weeks in the hospital would have ended on January 6, 2003, and not January 1, 2003. However, given the fact that Koulibaly appears to have simply given a general time frame in her asylum application for the amount of time she spent in the hospital, it would seem that this inconsistency is, if anything, minor.

### vi.      Vague Description of Koulibaly's Escape from the Hospital

Finally, the BIA notes that the IJ considered Koulibaly's description of her escape from the hospital to have been vague. This appears to be an accurate description of Koulibaly's testimony, especially under cross-examination.

### B.

In sum, it would seem that the BIA's conclusion that the IJ's adverse credibility determination was not clearly erroneous was based upon: (1) minor inconsistencies regarding Koulibaly's location on July 14, 2003, and the dates of her hospitalization; (2) a mistaken finding that Koulibaly failed to mention being beaten in her initial asylum application; (3) Koulibaly's failure to mention her hospitalization in her initial asylum application; (4) a chimerical inconsistency regarding the events leading up to Koulibaly's husband's arrest; and (5) Koulibaly's vague description of her escape from the hospital.

On balance, we conclude that substantial evidence fails to support the BIA's adverse credibility determination. We do so while still recognizing the deference afforded such determinations of the BIA. However, when such determinations are based upon an Assessment to Refer that has not been shown to be reliable, on a key factual mistake, and on inconsistencies that are either minor or do not go to the heart of the applicant's claims, the evidence compels reversal. *See, e.g.*, *Toma v. Gonzales*, 189 F. App'x 492 (6th Cir. 2006); *Vucaj v. Gonzales*, 150 F. App'x 444 (6th Cir. 2005); *Nwakanma v. Gonzales*, 126 F. App'x 699 (6th Cir. 2005); *Huang v. Ashcroft*, 113 F. App'x 695 (6th Cir. 2004).

### IV.

In light of the foregoing analysis, we grant Koulibaly's petition for review, vacate the judgment of the BIA, and remand for further consideration.

---

[7]The asylum officer's contemporaneous notes on this point state the following: "During the seven days I did not eat much and then one night I was taken out of my cell and they beat me and I fainted." It is not clear from the notes what question this statement was in response to.