**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0356n.06

**No. 08-3660**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**May 20, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| THIERNO AMADOU BARRY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON PETITION FOR REVIEW OF |
| | ) | AN ORDER OF THE BOARD OF |
| V. | ) | IMMIGRATION APPEALS |
| | ) | |
| | ) | |
| | ) | |
| ERIC H. HOLDER, JR., Attorney General, | ) | OPINION |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:   MOORE and McKEAGUE, Circuit Judges; FORESTER, Senior District Judge.[*]

FORESTER, Senior District Judge.

Petitioner-Appellant, Thierno Amadou Barry, seeks review of a Board of Immigration Appeals ("BIA") order affirming an Immigration Judge's ("IJ") denial of his claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). For the reasons set forth below, we DENY the petition for review.

**I.     Factual and Procedural Background**

Barry is a native of Guinea and claims that he entered the United States on June 9, 2001,

---

[*]     The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

using someone else's passport. There is no record of Barry's entry into the United States and he did not produce an airline ticket or I-94. Barry filed an application for asylum and withholding of removal based on political opinion and the CAT on August 7, 2001.

Barry provided background information in his application. He stated that he lived in Mamou, Guinea from 1971 to 2000, before fleeing to Conarky, Guinea and then to the United States in 2001. At the time that Barry left Guinea, the government of Lasana Conte dominated politics.[1] In his application, Barry claims that he is a member of the Union pour le Progres et la Renouveau or Union for Progress and Renewal ("UPR"), an opposition party. He stated that, in Guinea, he was a truck driver and used his skill as such to provide transportation to UPR members who were in need of a ride from their villages to vote in elections held on June 25, 2000. (JA 265) Since the "people of Mamou" felt that the election results were corrupt, they decided to protest and Barry provided transportation to them to the protest. (JA 265) As a result of the protest, members of the military arrested him, burned his truck and sent him to a military camp where he was tortured and humiliated. He stated that he was transferred to Kindia the next day where he was imprisoned in poor living conditions and was tortured until he had the chance to escape and come to the United States. (JA 271)

An asylum officer interviewed Barry and completed an Assessment to Refer the case to Immigration Court for further proceedings. (JA 125) The INS (now the Bureau of Immigration and Customs Enforcement ("ICE")) issued a Notice to Appeal on February 20, 2003, charging Barry with removability under § 212(a)(6)(A)(i) of the Immigration and Nationality Act. An initial decision

---

[1] According to the State Department, Conte died on December 22, 2008. His death sparked an immediate coup d'etat by elements of the military. The government is currently run by a military junta represented by a National Council for Democracy and Development.

2

denying Barry's requests for relief was issued on February 12, 2004, but a portion of the transcript from that hearing was blank so the BIA remanded the case for a new hearing. A second hearing was held on November 13, 2006, before Immigration Judge Charles E. Pazar sitting in Memphis, Tennessee.

During his oral testimony at the hearing, Barry provided additional details about his experiences in Guinea. He testified that he drove UPR members to the mayoral elections on June 25, 2000, and to the prefect office to hear the results on June 26, 2000. (JA 93-94) The UPR members were upset about the election results and believed there was cheating involved in the elections so they began shouting. (JA 80) Due to the shouting, the prefect office called the police and the military from Kindia and the military began beating and shooting the protesters. (JA 81) Barry identified two individuals that he saw die as a result of the military's actions. (JA 83) The military arrested Barry and others and transferred them to Kindia where they held Barry at Camp Kang Keme Ibrahama, a military camp, for one week. (JA 82-84) Barry testified that he was beaten every morning and his leg was injured as a result of the beating. (JA 84-85) Barry's brother worked out a deal with the military to allow Barry's escape from the military camp. (JA 86) One morning as Barry was taking out the garbage, the military guard told him to wait in a certain location, which he did, and then the military guard met him and gave him back his truck and took him to Conakry. (JA 86-87) Barry stayed in Conakry for a year but fled to the United States when people coming to Conakry from Mamou told him that the military was looking for him. (JA 88) Barry testified that he did not feel safe in Conakry because he believed that the military would kill him if they found him. (JA 89) He also believes that if he returned to Guinea, the military would kill him. (JA 89)

On cross examination, the government attorney highlighted a number of inconsistencies in

3

Barry's description of the events preceding his arrival in the United States. First, the government attorney told Barry that despite his testimony that he joined the UPR when it started in 2000, the UPR was formed in 1998 and asked Barry if that was possible. Barry responded that it was formed before 2000 but that he joined in 2000. (JA 91-92)

Second, the government attorney asked Barry about his testimony regarding what happened to Barry's truck after he was arrested. On cross, Barry stated that he never saw "that truck" again but in response to his attorney's question, he stated that "his truck" was returned to him when he was taken to Conarky after being released from Camp Keme. In his application, however, Barry said that the truck was burned. When asked about these inconsistencies, Barry testified that when he was arrested, the military destroyed his truck and he did not know what happened to it after it was destroyed. (JA 97-98)

Third, the government attorney questioned him about who assisted him with his escape. In response to his attorney's question, Barry testified that his brother helped him escape. (JA 86) The government attorney asked Barry whether he told the asylum officer that his father helped in his escape. (JA 99) In response to the government attorney's question, Barry testified that both his father and brother assisted him. (JA 99)

Fourth, the government attorney questioned Barry about where he was taken after his arrest. In response to his attorney's question, Barry said that he was taken to Camp Keme in Kindia, which was a military camp, and that he was held there for one week. (JA 83-84) The government attorney asked him if he told the asylum officer that he was taken to Camp Abatoir after his arrest. (JA 99) Barry responded that he was first taken to Abatoir in Mamou for one night, then to Camp Keme and was to be transferred to Camp Alpha Yaya but was released before the transfer could happen. (JA

4

100)

Fifth, the government attorney highlighted Barry's testimony about where he was arrested. In his initial testimony and again on cross, Barry stated that he was arrested in his truck. (JA 81, 97) The government attorney asked Barry if he told the asylum officer that he was arrested in his home. (JA 101) Barry stated that his house was not far from the prefect's office and that he drove to his house and the military went inside his house when they arrested him. (JA 102)

Finally, the government attorney questioned Barry about a letter from Siradiou Diallo which was submitted by Barry's attorney. The letter states that Barry is a member of UPR and was persecuted on several occasions as a result of his membership. Barry initially stated that he did not know who Siradiou Diallo was and that, although the letter came to his house, it was for someone else. (JA 103-104) After seeing the letter, Barry testified that he did know the author and that it was for him and explained that he did not understand what name the attorney and interpreter said to him. (JA 105)

After hearing testimony, the IJ issued a formal opinion denying Barry's application and ordered him removed to Guinea. The IJ concluded that Barry was not credible and that his testimony was uncorroborated. Alternatively, the IJ found that Barry failed to show that he entered the United States within one year of application for asylum and denied his asylum application on timeliness grounds. Barry appealed the IJ's decision to the BIA but declined to file a brief in support of his appeal. The BIA affirmed the IJ's decision. Barry filed this timely petition for review arguing that the IJ erred: (i) in finding him not credible; (2) in finding that he did not meet his burden of proof for asylum and withholding of removal because of lack of corroboration; (iii) in not applying the presumption of fear of future persecution based on his testimony regarding past persecution; and (iv)

5

in concluding that he did not qualify for relief under the CAT. The government argues that the IJ's credibility determination was supported by the evidence in the record.

## II.     Analysis

## A.     Eligibility for Asylum

The general standards for reviewing asylum cases are well-established. *See Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). This case raises an issue respecting the IJ's credibility determination. The IJ's finding that Barry was not credible is supported by substantial evidence and therefore must be upheld.[2] *Id.* at 703.

Even assuming that some of the other more minor inconsistencies identified by the IJ – such as the date Barry joined the UPR, whether he was arrested in his truck or home and who assisted in his escape of the camp – did not go to the heart of Barry's asylum claim, the IJ identified specific, serious inconsistencies in Barry's testimony that go to the heart of his claim sufficient to constitute substantial evidence for the IJ's determination. *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006). Specifically, the IJ identified inconsistencies in Barry's testimony at the hearing and in the Assessment to Refer about what happened to his truck after his arrest and how long and at what location he was jailed. Each of these inconsistencies can be seen as an attempt to enhance his claim of persecution; thus, they have bearing on his credibility. *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir.

---

[2] As this court has previously noted, "The REAL ID Act of 2005, Pub.L. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), changed the standard governing credibility determinations, stating that those determinations may be made 'without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim.'" *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). This provision, however, applies only to applications for asylum, withholding of removal and other claims for relief filed on or after May 11, 2005. *Id.* (citing Pub.L. 109-13, div. B, § 101(h)(2), 119 Stat. 231 at 305).

2004). Even if there may be explanations for these inconsistencies, the evidence does not show that any reasonable adjudicator would have been compelled to conclude that Barry was credible; thus, the IJ's credibility determination was supported by substantial evidence. 8 U.S.C. § 1852(b)(4)(B); *Koulibaly v. Mukasey*, 541 F.3d 613 (6th Cir. 2008).

It was permissible for the IJ to rely on discrepancies and inconsistencies between the Assessment to Refer, including the asylum officer's notes, and Barry's application and testimony because the Assessment to Refer contains sufficient indicia of reliability to use it to support an adverse credibility determination. *See Koulibaly*, 541 F.3d 613 (discussing the proper role of an Assessment to Refer in supporting an adverse credibility determination). While the notes are not comparable to a transcript of the interview, they are contemporaneous notes from the asylum officer, detailing the questions posed with notes of Barry's answers following most questions and Barry was under oath when he responded to the asylum officer's questions. Although the asylum officer did not testify at the removal hearing, on balance, these factors counsel for relying on the Assessment to Refer as substantial evidence for the adverse credibility determination. *Id.* at 621.

In addition, as the IJ noted, Barry failed to present any corroborating evidence that compels the conclusion that Barry was imprisoned for political reasons. To corroborate his testimony, Barry offered a letter from Mr. Diallo and 2002 and 2005 State Department country reports for Guinea. The Diallo letter states that Barry was a member of the UPR party and was a victim of persecution as a result of this membership. The letter, however, states that Barry was a "frequent" victim of persecution, but Barry testified that he was the victim only on one occasion. As the IJ noted, this discrepancy calls into question whether the letter corroborates Barry's testimony. Given that the lack of corroborating evidence to support an asylum applicant's statements is a factor that can be taken

7

into account in a credibility determination, *see Berri v. Gonzales*, 468 F.3d 390, 395-96 (6th Cir. 2006), these facts too support the IJ's determination that Barry's story was not credible.

While the State Department reports corroborate that violence occurred in connection with the municipal elections and that there are poor prison conditions in Guinea, they do not by themselves establish Barry's claim that he was actually impacted by the violence nor that he was ever imprisoned. Specifically, the 2002 State Department report references the violence surrounding the 2000 municipal elections. It states that there was no investigation into "the clashes between security forces, ruling party militants, and opposition party supporters during the 2000 municipal elections, which resulted in the deaths of eight persons and injuries to several others." (JA 250) The 2005 State Department report states that there were numerous notes of arrests during strikes and the use of force during demonstrations (JA 129) and that "there were reports of deaths in custody due to torture, abuse and neglect" and prison conditions "remained inhumane and life threatening." (JA 130) There is nothing, however, to establish that Barry was a victim of any of these conditions.

Accordingly, we uphold the IJ's determination that Barry did not qualify for asylum because Barry lacked credibility and provided no corroboration because it is supported by substantial evidence.

**B.    Withholding of Removal**

Barry also requested withholding of removal pursuant to § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3). Since Barry did not qualify for asylum because of his lack of credibility and corroboration, he necessarily does not qualify for withholding of removal, and we deny the petition for review of the BIA's decision. *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005).

**C.    Relief Pursuant to the Convention Against Torture**

Barry also petitions for review of the denial of his CAT claim. In light of Barry's lack of credibility, the IJ determined that Barry could not sustain his burden of proof and persuasion for protection under the CAT. Barry has not shown that torture was more likely than not to occur if he returned to Guinea; therefore, the IJ did not err in denying his application. 8 C.F.R. § 208.16(c)(2); *Berri*, 468 F.3d at 397-98.

While a CAT claim involves a "separate question of the threat of torture without regard to the enumerated ground for asylum" and "[i]t is possible . . . for an applicant to succeed on a [CAT] claim even though a withholding of removal claim under the INA is denied," Barry has not established that any reasonable adjudicator would have reached the opposite conclusion as the IJ. *Karomi v. Gonzales*, 168 Fed. Appx. 719, 729 (6th Cir. 2006). Although the State Department reports detail that violence occurs in connection with political demonstrations and that there are poor prison conditions in Guinea, they do not establish that Barry was or will be a victim of such violence nor that he was or will be imprisoned if he returns to Guinea. Moreover, the record reflects that Barry had a safe haven in Guinea because he lived there for approximately a year before coming to the United States. The IJ properly considered the possibility of future torture and found that Barry was not entitled to protection under the CAT.

## III. Conclusion

For the reasons set forth herein, we **DENY** the petition for review.