**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0692n.06
File Name: 09a0692n.06

No. 08-4398

**FILED**

**Oct 21, 2009**

LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **SOULEYMANE CAMARA,** | ) | |
| | ) | ON PETITION FOR REVIEW |
| *Petitioner*, | ) | OF A DECISION OF THE |
| | ) | BOARD OF IMMIGRATION |
| v. | ) | APPEALS |
| | ) | |
| **ERIC H. HOLDER, JR.,** Attorney General | ) | **O P I N I O N** |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

**BEFORE: MARTIN, COLE and KETHLEDGE, Circuit Judges.**

**COLE, Circuit Judge.** Souleymane Camara petitions for review of a decision by the Board of Immigration Appeals affirming an immigration judge's denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture. The immigration judge determined that Camara was not credible and that, even accepting his testimony as true, he had not established past persecution or a well-founded fear of future persecution. For the following reasons, we **DENY** Camara's petition for review.

**I. BACKGROUND**

Camara is a citizen of Guinea. He came to the United States in 1990, at the age of twenty-nine, on a temporary visa. In 1994, he filed for asylum, claiming that he feared persecution in Guinea because his stepfather was a former government minister who had been targeted by the

regime then in power. On February 28, 2005, a Department of Homeland Security ("DHS") officer interviewed Camara and referred him to a removal hearing before an immigration judge ("IJ"). At his master calendar hearing in 2006, Camara conceded removability but sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). On February 27, 2007, he filed an updated asylum application, claiming that he feared persecution in Guinea because of his political activities on behalf of the Rally of the Guinean People ("RPG") opposition party. The updated application also noted the government's past targeting of his stepfather.

At his merits hearing on March 7, 2007, Camara testified that his stepfather was the Guinean Information Minister until 1984, when a coup brought Lansana Conté to power and Camara's family fled to the Ivory Coast. Camara had stated in his initial asylum application that the Conté government wished to kill his entire family and, in his 2007 application, that his family had fled because his stepfather was suspected of planning a coup. At his hearing, Camara stated that he returned to Guinea a year after his family had fled, but did not fear persecution at that point because the government had targeted only his stepfather.

Camara also testified that he joined the RPG upon returning to Guinea, regularly attending party meetings and working to recruit high school and university students. According to him, the police often interrupted these meetings, threatening the members and the owner of the building where the meetings occurred. The police did not arrest anyone at the meetings Camara attended, but he stated that at other times several party members were arrested, including an individual who later was granted refugee status in the United States and now lives in Ohio. In April 1990, Camara received a "convocation" requiring that he report to the police; fearing arrest, he briefly went into hiding before obtaining a visa for travel to the United States. He left Guinea in 1990 without government interference. Camara testified that he became a member of the RPG in the United States

in 1992 and since has remained active in the party, sending money to RPG members in Guinea, occasionally receiving RPG newsletters, and on at least one occasion traveling to New York for a party meeting.

On cross-examination at his hearing, Camara conceded that he had presented no evidence to support his claims regarding his stepfather's identity or former government position. He also could not explain why his first asylum application had focused solely on his stepfather's position and not mentioned Camara's own political activities with the RPG. The Government pointed out that Camara's 2007 application stated that he had joined the RPG in 1997, while he stated in his asylum interview that he had joined in 1999. Camara explained that the party was evolving during this time and argued that this evolution accounted for the inconsistency. The Government also noted that, while Camara's 2007 application did not mention his receiving education above the high school level, he had testified to having received a university degree. Camara explained that the error was a result of his poor English-language ability, his refusing an interpreter and testifying in English notwithstanding. The Government also elicited testimony that Camara had a cousin in Columbus, whom he did not ask to appear on his behalf, and that he either had not asked the RPG member who lived in Ohio to appear on his behalf or that the individual had been unwilling to do so.

At the conclusion of the merits hearing, the IJ issued an oral decision denying Camara's application but granting him voluntary departure. The IJ found that Camara's story was not credible, pointing to several inconsistencies, including Camara's failure to mention his political activities in his initial application and the "more minor" inconsistency regarding his level of education. The IJ also found it reasonable to expect Camara to have provided evidence corroborating the identity of his stepfather and his own involvement with the RPG in Guinea, but that Camara had not done so. The IJ took into consideration the "convocation" summoning Camara to the police department, but

gave the document minimal weight because it was not translated into English and gave no indication (as far as the IJ could determine) that it was related to Camara's political activities. The IJ found, in any case, that the convocation did not overcome Camara's lack of credibility.

The IJ held that, even were he to accept Camara's testimony, Camara had not demonstrated past persecution or a well-founded fear of future persecution. The IJ reasoned that the alleged threats by Guinean police did not amount to past persecution and that Camara's alleged involvement with the RPG in Guinea and subsequent involvement with the party in the United States—which the IJ credited but found to be minimal—were insufficient to support an objectively reasonable fear of future persecution. In addition, the IJ held that the application was time-barred because it was not filed until four years after Camara arrived in the United States. Finally, the IJ stated that he would be disinclined to grant the application as a matter of discretion, even were it not time-barred, because of Camara's prior conviction for soliciting prostitution.

Camara appealed to the Board of Immigration Appeals ("BIA"), which dismissed his appeal on September 26, 2008. The BIA concluded that the IJ had erred in finding that Camara's application was time-barred, but held that this error was harmless because the IJ appropriately had found that Camara failed to meet his burden of proof based on credibility concerns and lack of corroboration. Camara then filed a timely petition for review of the BIA's decision with this court. We have jurisdiction under 8 U.S.C. § 1252(a).

## II. STANDARD OF REVIEW

Where the BIA adopts portions of the IJ's reasoning and supplements the IJ's opinion, we review the opinion as supplemented by the BIA. *See Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). We review the legal conclusions de novo, but we defer to the BIA's reasonable interpretations of the Immigration and Nationality Act ("INA"). *Id*. at 247 (citing *Koulibaly v.*

*Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008)). We review factual findings under a "substantial evidence" standard: in other words, we uphold such findings if supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Id*. (internal quotation marks and citation omitted). "Under this deferential standard, the court may not reverse the Board's determination simply because we would have decided the matter differently," *Koulibaly*, 541 F.3d at 619 (internal quotation marks and citation omitted); rather, findings of fact are conclusive "unless 'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Facts relevant to credibility determinations are reviewed under the same deferential standard. *Id.* (citing *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004)).

## III. DISCUSSION

Camara has not discussed his claims for either withholding of removal or relief under the CAT in his petition to this court. Therefore, we address only Camara's asylum claim. *See Shkabari v. Gonzales*, 427 F.3d 324, 327 n.1 (6th Cir. 2005) (deeming withholding and CAT protection claims waived where petitioners did not include any argument regarding these claims). Camara argues that the BIA erred in affirming both the IJ's adverse credibility determination and the IJ's finding that Camara had not demonstrated past persecution or a well-founded fear of persecution. We address these arguments in turn.

## A. Adverse Credibility Determination

Because Camara initially applied for asylum in 1994, the IJ's adverse credibility determination is governed by the legal standard in effect prior to the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), which governs applications for relief made on or after May 11, 2005. Under the pre-REAL ID standard, an adverse credibility determination "'must be supported by specific reasons [and] must be based on issues that go to the

heart of the applicant's claim.'" *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005) (quoting *Sylla*, 388 F.3d at 926). Only inconsistencies that can be interpreted as attempts to enhance the applicant's claim of persecution bear on credibility. *Sylla*, 388 F.3d at 926. "Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Liti*, 411 F.3d at 637 (internal quotation marks and citation omitted).

In this case, the record contains substantial, though not overwhelming, evidence in support of the IJ's adverse credibility determination. The IJ focused on the omission from the initial asylum application of Camara's political activities with the RPG in Guinea and the resulting threats he received from police, which enhanced his claim of persecution and formed the primary rationale for asylum that he advanced before the IJ. Although we exercise care in evaluating omissions from asylum applications, in recognition that aliens should not be expected to include a comprehensive recitation of their claim, omissions that are substantially related to an alien's claim may support an adverse credibility determination. *See Shkabari*, 427 F.3d at 329; *Liti*, 411 F.3d at 637-39. Because Camara's political activities and the resulting governmental threats were the primary grounds for his asylum claim before the IJ, his omitting these facts in his initial application provided substantial evidence for the IJ's adverse credibility determination. *Cf. Shkabari*, 427 F.3d at 329-30 (upholding an adverse credibility determination based on the alien's testimony that he was the chairman of a political party when this fact was not mentioned in his asylum application).

Camara relies on Ninth Circuit precedent that an alien's submission of two asylum applications focusing on different, though not contradictory, bases for asylum does not support an adverse credibility decision. *See Chanchavac v. INS*, 207 F.3d 584, 588 n.2 (9th Cir. 2000) ("All that can be concluded from the different focus of each application is that the notary and the lawyer reached different conclusions as to what parts of [the applicant's] story provided the basis for asylum

relief."). Camara's situation is different from that in *Chanchavac*, however, because his testimony in support of his updated application contradicted his initial application and strongly suggested that his original claim was false. The rationale of Camara's initial application—that the Conté regime wished to kill Camara's entire family because of Camara's stepfather's former government position—was rendered incredible by Camara's later testimony that he voluntarily returned to Guinea a year after his family had fled. Camara testified that he had no fear of reprisal before joining the RPG because the Conté government's sole focus was his stepfather. The IJ appropriately concluded that the contradiction between this testimony and the original asylum application undermined Camara's credibility.

In making his adverse credibility determination, the IJ did not err by taking into account the lack of corroborating evidence presented by Camara. *See Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (finding no error where IJ used applicant's failure to provide corroborating evidence as support for adverse credibility determination). "Although an alien is not required to produce corroborating evidence—his testimony alone can be sufficient—and such evidence may be difficult to ascertain, his failure to do so [may] further support[] the IJ's adverse credibility finding." *Zheng v. Holder*, 315 F. App'x 570, 573-74 (6th Cir. 2009) (citing *Pilica*, 388 F.3d at 954); *see also Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) ("[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided.") (internal quotation marks and citation omitted). Camara failed to present any documentary evidence or witness testimony regarding his stepfather's position or his own involvement with the RPG in Guinea. He also was unable to provide a satisfactory explanation for why the RPG member living in Ohio—whom Camara claimed had been arrested in Guinea during the time that Camara was recruiting for the RPG—had not testified on his behalf. There was no error

in the IJ's concluding that this dearth of corroborating evidence supported an adverse credibility determination.

We also disagree with Camara's remaining arguments that the IJ's credibility determination was based on improper grounds and so should be reversed. Camara argues that the IJ based his credibility determination on speculation and "personal and subjective beliefs," pointing to instances in the record where the IJ stated that he did not "believe" Camara to be credible. However, the IJ's frequent use of the word "believe" does not indicate there was an improper basis for the credibility determination, but simply that he drew a (reasonable) conclusion from Camara's application and testimony. Camara also argues that the IJ should not have relied on the inconsistency regarding Camara's level of education. While Camara is correct that his conflicting statements regarding his education do not go to the heart of his claim, substantial evidence nonetheless supports the IJ's credibility determination whether or not these statements are taken into account.

The IJ also relied on an inconsistency between Camara's testimony and a statement that Camara purportedly made in his 2005 asylum interview, to the effect that while living in Guinea, he had been arrested, detained for two days, and beaten. On cross-examination at the merits hearing, Camara testified that he could not recall whether he had made this statement, but that he had never been arrested or detained in Guinea. We have held that an asylum officer's statements in an Assessment to Refer (the document prepared by the officer at an asylum interview) should only be relied upon if they bear "sufficient indicia of reliability." *See Koulibaly*, 541 F.3d at 620-21. Neither this document nor the DHS officer's accompanying notes were included in the record, precluding review of whether such indicia were present. Again, however, the IJ's adverse credibility finding is supported by substantial evidence, even without this inconsistency.

## B. Persecution Determination

Even accepting Camara's testimony as true, the IJ's holding that Camara had not demonstrated past persecution or a well-founded fear of future persecution is also supported by substantial evidence. Under § 208 of the INA, an alien may be granted asylum if he demonstrates that he is a "refugee," 8 U.S.C. § 1158, which the INA defines as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Persecution entails "punishment or the infliction of suffering or harm, but harassment or discrimination without more" does not constitute persecution. *Sako v. Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006) (internal quotation marks and citation omitted). Past persecution gives rise to a rebuttable presumption that the applicant has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). A well-founded fear of future persecution can be based either on a likelihood of harm specifically targeted at the applicant or a pattern or practice of harm to others similarly situated. *See Sempagala v. Holder*, 318 F. App'x 418, 421 (6th Cir. 2009) (citing 8 C.F.R. § 208.13(b)(2)(iii)). In establishing a well-founded fear of persecution, "an applicant cannot rely on speculative conclusions or mere assertions of fear of possible persecution." *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (internal quotation marks and citation omitted). Rather, an alien's fear of persecution must be both subjectively genuine and objectively reasonable. *Id*.

The unspecified threats from police officers that Camara claims to have suffered while in Guinea clearly do not rise to the level of past persecution. *See, e.g.*, *Pilica*, 388 F.3d at 954 (finding no past persecution where applicant was twice arrested and detained and once beaten); *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (holding that KGB's repeated questioning of alien and searching alien's home did not amount to persecution). Camara argues that the arrests of other RPG members establish a pattern or practice of persecution against similarly situated persons that supports

his fear of future persecution. However, Camara's uncorroborated assertion that two RPG members were imprisoned in the late 1980s and his general claim that many RPG leaders have been arrested do not compel the conclusion that a pattern or practice of persecution exists. *See Mapouya*, 487 F.3d at 412 (requiring alien to present reasonably specific information, rather than speculative conclusions or mere assertions of fear of future persecution). Nor has Camara offered any reason to think that the current government is aware of his identity, his work as an RPG recruiter twenty years ago, or his limited involvement with the RPG in the United States. *Cf. Pilica*, 388 F.3d at 955 (finding no well-founded fear of persecution because petitioner's limited involvement in political demonstrations did not compel a finding that a reasonable possibility of persecution existed).

Camara points to the State Department's 2006 Country Report for Guinea, which states that "serious human rights abuses occurred during the year," that there were arbitrary arrests of civilians, that prison conditions were inhumane and life-threatening, and that at least fifteen people were killed by Guinean security forces. However, the Country Report also states that "[i]n practice, most political detentions rarely exceeded a few days." Camara offers no persuasive argument that the Report alone would compel a reasonable adjudicator to reach a persecution determination different than the IJ's. *Cf. Barry v. Holder*, 327 F. App'x 611, 615 (6th Cir. 2009) (holding that election-related violence and inhumane prison conditions in Guinea described in 2002 and 2005 Country Reports did not establish that applicant was a victim of these conditions). In the absence of evidence that would compel a contrary conclusion, we may not reverse the IJ's decision as affirmed by the BIA.

## IV. CONCLUSION

For the foregoing reasons, we **DENY** Camara's petition for review.