NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0591n.06

No. 14-3621

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

ABDOU ABDOU MOHAMEDENE,

      Petitioner,

v.

LORETTA E. LYNCH, Attorney
General,

      Respondent.

**FILED**
Aug 19, 2015
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW FROM
THE UNITED STATES BOARD OF
IMMIGRATION APPEALS

BEFORE:    SUHRHEINRICH, CLAY, and ROGERS, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Abdou Mohamedene filed an application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). *See* 8 U.S.C. §§ 1158(a), 1231(b)(3)(A); 8 C.F.R. 208.16(c). An immigration judge (IJ) denied the application and ordered Mohamedene removed from the United States to Mauritania. The Board of Immigration Appeals (BIA) dismissed Mohamedene's appeal, and he subsequently filed this petition seeking review of the BIA's order. For the reasons set forth below, we deny the petition for review.

### FACTUAL BACKGROUND

Mohamedene is a native and citizen of Mauritania. He arrived in the United States at New York, New York, in December 2009, and he was admitted as a non-immigrant B-1 visitor. Mohamedene was authorized to remain in the United States temporarily, but not beyond March

2, 2010. On the last day that he was legally permitted to be in this country, Mohamedene filed an application for asylum, withholding of removal, and protection under the CAT. He continued to reside in the United States after filing his application. In July 2010, the Department of Homeland Security filed a Notice to Appear in the immigration court, alleging that Mohamedene was in the United States without authorization and charging him with removability pursuant to 8 U.S.C. § 1227(a)(1)(B).

In his appearance before an IJ, Mohamedene admitted the factual allegations in the Notice to Appear and conceded that he was removable. However, he wished to continue pursuing his application for asylum, withholding of removal, and CAT protection.

In May 2013, a merits hearing was held before the IJ on Mohamedene's application. Mohamedene submitted documentary evidence to the immigration court, including a newspaper article he authored, a work certificate from a Mauritania news agency, a membership identification card for a Mauritanian political organization, a police report indicating that his luggage was stolen, affidavits from family members and social and professional contacts, and a warrant for his arrest issued by Mauritania's Ministry of Justice. Mohamedene also testified during the hearing, but he called no other witnesses.

Mohamedene was born on December 31, 1967, in Mauritania. He testified that his parents, now both deceased, came from different tribes. His father is from a black tribe and his mother is from a white tribe, and Mohamedene and his family were discriminated against because of this fact. Mohamedene asserts that in Mauritania, blacks are considered slaves, and miscegenation is considered a crime.

Mohamedene attained a high school diploma but pursued no further education. After completing high school, he spent several years working for a cattle rancher. He then went to

Nouakchott, Mauritania, and began working part-time for an Associated Press (AP) journalist. Mohamedene described his work as that of an apprentice—when the AP journalist was reporting from the field, Mohamedene assisted with the media equipment and with the writing. The AP journalist was highly educated and wrote about the about the problems in Mauritania, particularly human rights abuses. He was a member of the Assembly of the Democratic Forces political party ("RFD"), an opposition party, and he faced government harassment because of his writings and political affiliation. Mohamedene worked for the AP journalist from 2003 until 2005.

Mohamedene joined the RFD in 2006 because he believed in the party's mission. He also joined because the AP journalist convinced him that the RFD was a viable opposition party. Among other things, Mohamedene passed out leaflets and helped organize demonstrations on behalf of the RFD. He also published "several" articles espousing his views on freedom and equality. Admin. R. at 172. When asked how many, he first said "three or four," and when pressed further, he said "three." *Id.* Mohamedene claims that the Mauritanian government knew he was a participant in the RFD because of his demonstration work and his writings. On one occasion, he was arrested by three police officers at a demonstration and held for three days. He was beaten while in custody, and eventually released because of his injuries. He has never otherwise been arrested.

On cross-examination, Mohamedene was asked additional questions about his RFD membership. He had previously testified that he joined RFD in 2006, so the government asked why his membership card was dated May 2007. He responded that it must be the renewal card. He explained that he received a renewed membership card from the RFD annually, but that he does not have copies of the membership cards he received over the years.

Mohamedene also testified that he is married and has several children. He and his wife are from different tribes; he is considered black and she is considered white. Because miscegenation is considered a crime, he and his wife were married in secret. News of their relationship only became public when his wife became pregnant with their first child. Mohamedene presented the IJ with Mauritanian judicial decrees documenting the birth of his children, and he explained that the government recognizes his children.

Mohamedene further testified that he was harassed by his wife's tribe and family, and even received death threats. Even though he had no knowledge of a black man ever being killed for marrying a white woman, Mohamedene believed that his brother-in-law would make good on the threat to kill him if given the chance. He had been assaulted by his wife's family on at least four occasions. He explained that one of those occasions was while he was held at the police station in 2008 after being arrested at a demonstration; his brother-in-law was there, and it was he who hit Mohamedene, not the police.

Mohamedene entered the United States in December 2009, and shortly thereafter filed the application that is the subject of the instant case. In support of his application, Mohamedene submitted a warrant for his arrest issued by Mauritania's Ministry of Justice. It was sent to him by his brother, who obtained it from a friend. The warrant, issued while Mohamedene was in the United States, was in response to an article he published in an opposition newspaper in Mauritania after he arrived in the United States. When asked how his brother got a copy of the arrest warrant, Mohamedene said that his brother had a friend in the police department who retrieved it for him. Mohamedene further testified that the police never sent the warrant to his family members or anyone else.

Mohamedene provided further testimony about the article that was the cause for a warrant being issued for his arrest. He testified that he sent the article to the newspaper with a photo of himself. The article discusses corruption and the lack of equality in Mauritania and was similar to articles Mohamedene had previously published in the same paper. When asked why he was unable to provide an issue of the newspaper in which the article was published, Mohamedene explained that he had a copy of the paper in his suitcase while traveling by bus from New York to Cincinnati, but the luggage was stolen during the trip. He filed a police report for the stolen bag but it was never recovered.

On cross-examination, Mohamedene testified that he did not actually send the article to the Mauritanian newspaper directly; rather, he mailed it to the AP journalist to submit to the paper. Mohamedene sent the article at "[t]he beginning of 2010," and it was published on January 4, 2010. *Id.* at 186. He explained that he was unable to get another copy of the newspaper because there is no archival system, and it is very difficult to get copies of old newspapers. When asked why he sent a photo with the article, Mohamedene responded that it was the AP journalist who added the photo. When asked why the reporter had a photo of him, Mohamedene stated, "He was my friend. He was my boss. He was everything. He had pictures of me." When asked where the photo came from, he said that it was a picture taken while he was in the RFD. When asked why the newspaper photo was identical to the photo used in his visa application, Mohamedene explained that the AP journalist was with him when he took his visa photos, and he gave the reporter one of the extra photos that were snapped.

Mohamedene further testified that a friend and fellow Mauritanian, Mostapha Val, helped prepare his application because Mohamedene did not read or speak English. He met Val in New York City. Mohamedene stated that he would stay with Val for a week at time when he would

visit New York from Kentucky. Mohamedene lived in Kentucky and had a permanent address there. When asked why he listed Val's New York address on the stolen luggage police report even though he lived in Kentucky, he claimed he could not remember why he did that. In his asylum application, Mohamedene indicated that his Kentucky address was the only address where he had ever resided in the United States. When questioned about it, he explained that he lived in New York for three or four months, and did not put all his previous American addresses in the asylum application.

Mohamedene was also questioned about his Mauritanian national identification ("ID") number. The ID number is given at birth, and Mohamedene's ID number was listed on his arrest warrant. When the government pointed out that the identification numbers on Mohamedene's birth certificate and arrest warrant were different, he responded that the birth certificate has its own unique identification number and that each citizen has two identification numbers—the one listed on the birth certificate and a national ID number.

As part of his asylum application, Mohamedene also submitted affidavits from his family, the AP journalist, and the leader of the RFD. His brother collected the letters and sent them to him. Mohamedene concluded his examination by testifying that slavery still exists in Mauritania and that he fears that, because of his political views and his status as black man, he will be killed if he ever returns to the country. The court then heard argument from the parties before concluding the hearing.

In a lengthy opinion, the IJ summarized the hearing testimony, laid out the applicable law, determined that Mohamedene lacked credibility, and held that the evidence Mohamedene presented only minimally corroborated his claims, if at all. The IJ denied the application and ordered Mohamedene removed to Mauritania. Mohamedene appealed, and the BIA concluded

that he did not meet his burden of proving eligibility for asylum, withholding of removal, and protection under the CAT. This petition for review followed.

## STANDARD OF REVIEW

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). Where, as here, the BIA "adopts the IJ's decision and supplements that decision with its own comments," we review both opinions. *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011).

Questions of law are reviewed *de novo*, giving substantial deference to the BIA's interpretations of the Immigration and Nationality Act. *See Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). Factual findings, including those relevant to "credibility determinations, denial of asylum applications, withholding of removal, and the CAT," are reviewed for substantial evidence.[1] *Id.* Under this deferential standard, "we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Parlak v. Holder*, 578 F.3d 457, 462 (6th Cir. 2009) (internal quotation marks omitted). The BIA's findings of fact are conclusive "unless the Court finds that any reasonable adjudicator would be compelled to conclude to the contrary." *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010) (internal quotation marks omitted). "In other words, in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not

---

[1] The REAL ID Act of 2005 applies to applications for asylum, withholding of removal, and CAT relief filed on or after May 11, 2005. *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). The Act permits the IJ to consider "any inaccuracies or falsehoods in an applicant's statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) (internal quotation marks omitted). An adverse credibility determination can be fatal to an applicant's claims for asylum, withholding of removal, and protection under the CAT. *Id.*

only support a contrary conclusion, but indeed *compels it*." *Hassan v. Holder*, 604 F.3d 915, 925 (6th Cir. 2010) (internal quotation marks omitted).

## DISCUSSION

### I.  Legal Framework

"To establish eligibility for asylum, an applicant must establish he is a 'refugee' within the meaning of" the statute. *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009). "Refugee" is defined as a person "who is unable or unwilling to return to . . . [his] country [of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion." 8 U.S.C. § 1101(a)(42). For an applicant to establish himself as a refugee, he must demonstrate that one of the aforementioned protected grounds "was or will be at least one central reason for" his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). "The asylum applicant who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution." *Ouda v. I.N.S.*, 324 F.3d 445, 452 (6th Cir. 2003). Absent evidence of past persecution, however, the applicant must "prove a well-founded fear of future persecution." *Allabani v. Gonzales*, 402 F.3d 668, 674 (6th Cir. 2005). To do so, he must show that he "actually fear[s] that he will be persecuted upon return to his country, and he must present evidence establishing an objective situation under which his fear can be deemed reasonable." *Id.* (internal quotation marks omitted). The "well-founded fear" standard is not a preponderance of the evidence standard; "one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Selami v. Gonzales*, 423 F.3d 621, 625 (6th Cir. 2005) (internal quotation marks omitted).

To qualify for withholding of removal, the applicant must demonstrate that if returned to his country of origin there is a "clear probability" that he would be subject to persecution because of his race, religion, nationality, social affiliation, or political opinion. *Gilaj v. Gonzales*, 408 F.3d 275, 289 (6th Cir. 2005) (per curiam). A "clear probability" means that it is more likely than not that the applicant would be subject to persecution. *Al-Ghorbani v. Holder*, 585 F.3d 980, 993–94 (6th Cir. 2009). It is more difficult to obtain relief pursuant to an application for withholding of removal than it is pursuant to an application for asylum because "[t]he burden of proof for withholding of removal is more exacting than that for asylum." *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006). Failure to satisfy the lower burden of proof for asylum proceedings necessarily results in failure to establish eligibility for withholding of removal. *See Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004).

To establish eligibility for relief under the CAT, the applicant must show that it is more likely than not that he would be tortured if deported to the proposed country of removal. *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009) (citing 8 C.F.R. § 1208.16(c)(2)). "Torture, in any of its myriad manifestations, must entail the intentional infliction of severe mental or physical pain upon an individual by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Alhaj v. Holder*, 576 F.3d 533, 539 (6th Cir. 2009) (internal quotation marks omitted). If an applicant is determined to be not credible, he cannot rely on his discredited testimony to meet his burden for CAT protection. *Slyusar*, 740 F.3d at 1074.

## II.    Adverse Credibility Determination

The IJ found that Mohamedene's testimony undermined his credibility. Some aspects of his testimony were contradictory. At times he did not answer questions; at other times he

prevaricated. And "[m]any questions had to be repeated in order to get [Mohamedene] to respond to the specific question asked . . . [as] [h]e often appeared to be controlling the response rather than being responsive." Admin. R. at 72.

The IJ pointed to numerous examples to support her finding that Mohamedene's testimony was less than credible. For one, his testimony regarding the January 4, 2010 article he published was inconsistent. Mohamedene first testified that he mailed the article and his photo to the newspaper to be published. Then he clarified that he sent the document and photo to the AP journalist, who in turn provided them to the newspaper for publication. He then altered his story again and said that the AP journalist already had the photo and it was taken at an RFD event. Upon further probing, Mohamedene advanced a yet slightly different narrative—that the AP journalist was present when he had his visa photo taken, and he gave the reporter the extra photo that was recorded.

In support of the finding that Mohamedene's testimony was not credible, the IJ also pointed to his documented residence in the United States. In the police report Mohamedene filed, he listed his New York City address. In his asylum application, he listed his Kentucky address as being the only place he has ever lived in the United States. Testifying before the court, Mohamedene affirmed that he has always resided in Kentucky, but then backtracked and stated that he lived in New York for three to four months at one point.

The IJ also cited Mohamedene's RFD membership as giving her pause on whether to believe his testimony. He claimed that he joined the RFD sometime in 2006, he acknowledged that his application was dated December 2006, and he testified that he renewed his membership annually. The RFD card he entered in record, which he claims is a renewal card, is dated May

2007. The IJ was understandably confounded as to why Mohamedene's annual membership was renewed five months after first joining the organization.

Other examples the IJ pointed to include the fact that Mohamedene testified that he mailed the article (from the United States to Mauritania) at the beginning of 2010 but was unable to explain how the article was published (so quickly) on January 4, 2010. Mohamedene was also unable to provide a satisfactory answer why his birth certificate and arrest warrant had different national identification numbers. While the IJ acknowledged that all the explanations and discrepancies she mentioned "might individually be insignificant," she went on to conclude that "in combination they call into question [Mohamedene's] credibility." *Id.* at 73.

The BIA agreed with the IJ that the above-cited examples "diminished [Mohamedene's] credibility and undercut the persuasive value of his claim overall." *Id.* at 4. The BIA also rejected Mohamedene's explanations on appeal as unpersuasive and inadequate.

Mohamedene argues that the IJ and the BIA misunderstood and mischaracterized his testimony, and also gave undue weight to minor inconsistences in his testimony. Specifically, he argues that the inconsistencies in his testimony were simply clarifications, and that his testimony was otherwise uncontradicted. Because the IJ's and the BIA's credibility determinations are supported by substantial evidence, we reject Mohamedene's arguments.

The adverse credibility determinations are supported by numerous examples that indicate that Mohamedene may have been shading the truth if not lying outright. Moreover, Mohamedene has not presented evidence or argument that would *compel* a reasonable adjudicator to disagree with the IJ's finding. It is possible that a factfinder could reasonably determine that between the translator, Mohamedene's anxiousness, and the high stakes of the proceeding, any discrepancies in Mohamedene's testimony should be disregarded. However,

that is not the standard—"[t]hat this Court could conceivably make a contrary conclusion is not enough to justify reversal of the IJ's decision; compulsion is required." *Slyusar*, 740 F.3d at 1073. And even acknowledging that some of the inconsistencies in Mohamedene's testimony were insignificant, the BIA's decision must still be upheld because "under the REAL ID Act, even ancillary inconsistencies in a petitioner's testimony support adverse credibility determinations." *Id.* Indeed, we have upheld adverse credibility determinations for similarly inconsequential inconsistencies. *See, e.g.*, *Yong Xing Deng v. Holder*, 572 F. App'x 331, 333 (6th Cir. 2014) (per curiam).

## III. Corroborating Evidence

Notwithstanding Mohamedene's lack of credibility, the IJ went on to examine the application based upon the corroborating evidence submitted. The IJ found: that Mohamedene's work certificate verified his work in Mauritania; that the AP journalist's affidavit verified that Mohamedene worked in journalism in some capacity; that the copy of the article indicated that it may have actually been published; and that the RFD card and the affidavit from the leader of the party tended to verify Mohamedene's membership in the RFD. The IJ concluded that this evidence partially corroborated Mohamedene's claim.

However, the IJ took issue with the rest of the evidence provided. The affidavit from Mohamedene's wife does not mention (let alone explain) their racial differences or the race-based threats and violence her family inflicted upon him. The affidavit from Mohamedene's brother only mentions the fact that he obtained the arrest warrant from a friend; it does not refer to the slave conditions under which he and Mohamedene allegedly grew up, nor does it discuss the problems between Mohamedene and his wife's family. Accordingly, the IJ determined that the letters are "very general and do not provide sufficient information to overcome respondent's

lack of credibility or to support his claim, specifically to conditions concerning their racial difference." Admin. R. at 74.

The IJ also found the fact that Mohamedene was able to marry his wife, register the marriage, and record the births of their intertribal, mixed-race children, all cast doubt on his claim of visceral and widespread racial discrimination. The IJ further determined that it was troubling that Mohamedene provided no evidence regarding any of the other articles he claimed to have published. Mohamedene also failed to provide any information regarding the circulation of the newspapers in which the articles were published or that the government even knew about the articles.

Regarding Mohamedene's RFD membership, the IJ found that although the affidavit from the party leader verified the fact of membership, it did not discuss what, if any, activism Mohamedene had undertaken. The IJ deemed the arrest warrant suspect "because of the discrepancy in the identification information contained on it and the fact that [Mohamedene's] brother" did not mention "it was obtained from a police officer or even why the police officer would be willing to provide the documentation to [him]." *Id.* at 77. The IJ also took issue with the timing of the warrant, finding it implausible that the first warrant for Mohamedene's arrest would be issued only after he wrote an article while out of the country, when he had previously written three other articles.

For these reasons, the IJ determined that Mohamedene was not a refugee—he had not established that he had been persecuted in the past, nor had he established that he had a well-founded fear of persecution should he be removed to Mauritania. Because the IJ found that Mohamedene had not met his burden for his asylum application, she also found that he necessarily failed to meet his burden for withholding of removal. Finally, the IJ ruled against

Mohamedene on his CAT claim, finding that there was not a sufficient likelihood that he would be arrested and tortured by or with the acquiescence of the government.

The BIA agreed, concluding that Mohamedene's corroborating evidence "did not sufficiently rehabilitate his discredited testimony or independently satisfy his burden of proof." *Id.* at 4.

The IJ's and the BIA's findings that Mohamedene is not eligible for asylum, withholding, or CAT protection are supported by substantial evidence. Mohamedene relies on vague assertions of slave treatment, an uncorroborated claim of discrimination based on his mixed marriage, and alleged threats from his wife's family to support his claim for past persecution based on race. He relies on an unsubstantiated claim of arrest at a demonstration followed by a three-day period of detention and a beating to support his claim for past persecution based on political opinion. Mohamedene also maintains that he will be killed if removed to Mauritania "because of his actual and imputed political opinions, because he has not respected his status as a slave, and because he has violated the expected norms of his social group by marrying someone of another race from another tribe." Pet'r's Br. at 13. Because his claims are uncorroborated and both the IJ and BIA found his testimony not credible, Mohamedene's asylum, withholding, and CAT applications all fail. *See Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) ("Because [the petitioner's] testimony plausibly could be viewed as incredible, and certainly could be viewed as inconsistent or incoherent, a fact finder reasonably could find that [the petitioner's] testimony, absent corroboration, was insufficient to meet his burden of proof." ).

## CONCLUSION

For the foregoing reasons, we deny the petition for review.